Larry Stockett
3769 Mesa Linda Drive
Las Vegas, Nevada 89120

Defendant (PRO SE)
(702) 451-8381



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| Securities and Exchange Commission, | : | |
| Plaintiff, | : | CV-S-02-0607-PMP-LRL |
| v.        : | : | |
| Larry A. Stockett, | : | |
| Defendant. | : | |

## DEFENDANT'S VERIFIED RESPONSE TO COMPLAINT



Defendant Larry A. Stockett, (PRO SE) submits this verified response to the Complaint as follows: (Paragraph numbers correspond to paragraph numbers in the Complaint).

## I.     SUMMARY

1. Since at least July 1999 and continuing to date, Defendant Larry A. Stockett ("Stockett") has voluntarily and under three subpoenas fully cooperated with the Securities and Exchange Commission in providing all requested documents, testimony, and depositions in the ongoing investigation of Mr. Stockett by the Commission. Through the course of responding to the subpoenas and answering questions under oath at two depositions lasting five days, Mr. Stockett has provided hundreds of documents, thousands of pages of documentation and many hours of verbal testimony (hundreds of pages of transcripts) all under oath that has disputed each and every allegation contained in the Complaint. Furthermore, Mr. Stockett will be able to show at trial, through discovery and cross-examination, that each and every witness that has provided testimony against Mr. Stockett has provided false and misleading statements and has omitted material facts known to them that will prove Mr. Stockett did not commit fraudulent conduct. Mr. Stockett relied on signed contracts, financing commitments, and legitimate agreements negotiated in good faith for each and every press release that he issued. Mr. Stockett used extensive due diligence and believed the information contained in the press releases were true at the time he issued them. The company failed to obtain the financing

committed to in the agreements with Inter Oil Gulf and Akropolis Ventures and therefore, the proposed acquisitions, proposed distribution network, and projected revenue of the company has yet to materialize. This does not mean that the company did not conduct legitimate business. It simply means the company failed to achieve adequate financing for the legitimate business it has been developing and undertaking for the past three years. It would be much easier to give up, admit failure and quit, or form another private company than to continue operating a public company in the face of a complaint, press release, and resulting newspaper articles (attached in Attachment 4) stating that the SEC is claiming that the company has not conducted any legitimate business for the past three years. This would be to deny the legitimate daily effort by Mr. Stockett working full time for over six years and several man-years of legitimate effort conducted by his staff and consultants to the company to find a successful business through start up, acquisition, or joint venture. The work products of the company are reflected in the hundreds of documents, business plans, contracts, letters of intent for acquisitions, financial statements of companies proposed to be acquired, thousands of legitimate email communications with potential suppliers, potential customers, potential financing sources, potential distributors, etc. Mr. Stockett owes over $2 million that he borrowed and invested into these businesses, and most of his stock received for his investments were posted as collateral for his personal loans.   If the SEC wants to force Mr. Stockett and the companies out of business, at least let him have a fair and full trial and make the SEC prove that their allegations will hold up under the weight of cross-examination and evidence fairly and legally obtained. This cannot be done in the twenty days since the complaint was filed or in a hearing that may last fifteen minutes for defense against an

3

injunction that proposes to put Mr. Stockett and the company out of business. In the interest of justice, it should not be done by changing venue. This puts additional undue financial burden on Mr. Stockett who must now defend himself pro se because his attorney is not licensed in Nevada. Defendant's Attachment 2, shows that Declan O'Donnell has been representing the Defendant since December 8, 2000 in the ongoing investigation of Mr. Stockett. The SEC now wants to try the resulting case in Nevada after Mr. Stockett has incurred over twenty thousand in (mostly unpaid) legal fees and was required to provide depositions for five days in Colorado.

There is no undisputed evidence to support preliminary injunction or other relief sought by Plaintiff unless and until such time as the Plaintiffs have proven that Mr. Stockett's actions or conduct poses a risk to the public or the Plaintiff has proven their case at trial. To the contrary, the Plaintiff's proposed relief, if granted, will assure that hundreds of public shareholders will lose their entire investment, and that the company will go out of business if the relief is granted. This case could take a year or more to go to trial, and in the interim, the false and misleading press release issued by the SEC that so absurdly omits the material facts in this case, would virtually make it impossible to conduct business if a temporary injunction is imposed before any finding of guilt. All of Hightec shareholders, in all likelihood, have taken the opportunity to view the company web site on the Internet that fully discloses the company business plan, strategies, and dependence on obtaining financing and fully discloses that there can be no assurances that the company will be successful in achieving such financing. No place in the web site does it claim the company has achieved any significant sales, and no place does it make any

4

false claims or fraudulent statements.  Mr. Stockett has provided more detailed disclosure

on his web site than most non-reporting, pink sheet listed companies that are

development stage and have no significant revenues to report.  Mr. Stockett has fully

answered the complaint, herein, and has submitted a Memorandum in opposition to

Plaintifff's Motion for Preliminary Injunction and has shown cause why such Preliminary

injunction should be denied.

Furthermore, the declarations and attachments that the Plaintiff's council cites as

undisputed evidence sufficient to justify preliminary injunction, in fact prove the

contrary.  The false allegations made by Plaintiff in the complaint and in press releases

repeating the false allegations are disproved by documents contained in the attachments

to the declaration of Kelli Chan and in the Defendants attachments hereto.  Documents

disproving most of the major allegations are cited in this response.  Additional documents

previously provided under oath but not contained in the Plaintiff's attachments, were not

all readily available because none of the documents seized by the FBI have been returned

to the Defendant in the past year.

Since December 8, 20000, Mr. Stockett has been represented by his attorney, Declan

O'Donnell, for the depositions held in Denver, Colorado.   Mr. Stockett personally gave

two depositions in Denver, Colorado in 2001, and 2002 that lasted three days and twos

days respectfully.  After incurring legal fees in excess of $20,000 (mostly unpaid), the

SEC has filed a complaint in Las Vegas, and two in Washington, D.C. against Hightec,

Inc. and Sinclare Group, Inc.  Mr. Stockett's attorney is not licensed to practice in

Nevada or Washington, DC. With high unpaid legal expenses it is impossible for Mr. O'Donnell or Mr. Stockett to obtain new Nevada counsel and review the thousands of pages of documents and hundreds of pages of depositions, and transcripts of verbal testimony is prohibitive and imposes an unfair economic burden on Mr. Stockett. Mr. Stockett therefore requests that this complaint be denied, re-filed or transferred to the United States District Court, District of Colorado, where Mr. Stockett can continue to be represented by Mr. O'Donnell without additional legal expenses of unnecessary Nevada counsel. If it was good enough for Plaintiff's to deposition Mr. Stockett twice in Colorado, why should they now be allowed to change venues and seek temporary injunctive relief in a new venue when Mr. Stockett has lived and worked in Nevada during the entire duration of the SEC investigation?

This case not only involves false allegations knowingly made by SEC counsel in spite of obvious and compelling evidence provided under oath without any undisputed evidence to the contrary, it also involves the violation by the same SEC attorney of Mr. Stockett''s rights to a fair trial. The SEC has admitted on page 15 of Kelli Chan's declarations, that she viewed documents seized by the FBI under a criminal search warrant issued March 29, 2001 of Mr. Stockett's residence. A copy of the FBI search warrant and list of computers and documents seized by the FBI is attached hereto as Attachment 5. She did not provide any legal notice to Mr. Stockett or his attorney or use due process to transfer these documents from the FBI to the SEC for a civil administrative proceeding. The documents included virtually all of Mr. Stockett's corporate records contained on his personal computer, all other personal computer files, email files, bank statements, stock

6

records, attorney client email communications, etc. On page 25 of Kelli Chan's

declarations she admits again that she obtained documents from the FBI without due

process and questioned Mr. Stockett about a document from Mr. Stockett's computer

which itemized a list of allegations against Mr. Stockett which he summarized from

allegations made on Raging Bull web site titled "Things I could get in trouble for". This

document was prepared by Mr. Stockett's as a response to allegations on the Internet and

a checklist for his attorney prior to the SEC depositions conducted by Kelli Chan. By

reviewing Mr. Stockett's entire business records and computer files, and Mr. Stockett's

email communications between Mr. Stockett and his attorney, the SEC has totally

bypassed the rules of evidence, and utilized Mr. Stockett's personal files obtained without

due process from the FBI to build their one sided civil case against him. This blatant

disregard for Mr. Stockett's rights should be immediate grounds for dismissal of the

complaint. Mr. Stockett's records seized by the FBI should not be allowed as evidence in

a civil complaint when the evidence was obtained from a criminal investigation. An

argument could be made that the entire case was built around a fishing trip or witch hunt

for evidence and potential witnesses after Ms. Chan when fishing in Mr. Stockett's

personal computer thanks to the FBI criminal investigation. To date Mr. Stockett has not

been formally charged with any criminal violations and such records should not be

available to the public or The SEC unless lawfully obtained by subpoena and deposition

and with proper notice to Mr. Stockett's attorney so he could object to those documents

that included attorney client communications. It is especially abusive when the very

communications used as a list of violations by the SEC was the communications prepared

by Mr. Stockett for his defense attorney prior to the depositions and are now being

wrongly cited as Mr. Stockett's "Admissions as to the Falsity of the Above Public Statements". Mr. Stockett's 5th Amendment rights have been violated by virtue of the SEC eliminating his right to not incriminate himself and right to attorney client privileged communications regarding any allegations against him. While Mr. Stockett has not tried to avoid answering any questions or providing any documents requested, the manner in which the SEC has obtained evidence provided under criminal search warrant without due process for a civil administrative proceeding is a clear violation of his rights, and should be treated accordingly in the interest of justice.

The summary of the Plaintiff's case asserts that "neither Hightec nor Sinclare has had any operations, revenue, assets or legitimate business activities over the last three years... and through the media, Stockett has continuously misrepresented, among other things, the assets, business operations, financial condition and income prospects of the two entities." This summary is false and misleading and omits material facts that were known to the Plaintiff's counsel and these highly damaging statements therefore totally distort the facts. These false and misleading statements can be disproved by the very documents that the SEC cites in their own Declarations and Attachments as itemized below and further supplemented by Mr. Stockett's Attachments hereto.

Mr. Stockett has provided extensive documentation as to the operations, revenue, assets, profits (loss to date) from personal stock sales and legitimate business activities of his companies over the last three years. The SEC has blatantly ignored the evidence submitted under sworn testimony and the documents that prove without any rebuttal or

testimony to the contrary that Mr. Stockett has continuously conducted legitimate

business including:

    A.  Development stage activities associated with legitimate business plans and

        operational activities for the importing of

low cost, foreign cement from Asia to the United States.   (Attachment 17)

Legitimate activities included:

           i.     Mr. Stockett obtained cement samples from foreign suppliers

                  (Samples were shipped from China and Thailand to U.S. Cement

                  company in Las Vegas)

          ii.    Mr. Stockett obtained agreements to distribute cement with foreign

                  suppliers including Inter Oil Gulf Hong Kong (China) Plaintiffs

                  Attachment 23 pages 1-8), and TPI Polene (Thailand) (Defendant's

                  Attachment 6).  These agreement took months of negotiations and

                  many emails and multiple drafts of contracts between Mr. Stockett

                  and the suppliers and their representatives and business trips to

                  Hong Kong, London and other meetings with their representatives

                  before final supply contracts were executed by all parties.

         iii.   Mr. Stockett hired experienced personal in the cement industry to

                  operate the company and market cement, including:

                  Dale Olive (former Royal Cement Company plant manager for 13

                  years) worked for U.S. Cement as

                  Vice President for approximately one year. Compensation: $8,000

per month.  Mr. Olive visited all

shipping, storage and handling locations and all potential suppliers

for materials handling including many

trips to import facilities in San Diego, Los Angeles, San Francisco,

Sacramento, Houston, Reno, world

of Concrete trade shows, etc.

John Oswald (former Ready Mix company manager with 25 years

experience in concrete industry),

served as President of U.S. Cement for approximately six months.

Compensation $6,000 per month.

Cort Hooper (VP Sales, experienced sand and gravel business

owner)  called on over 100 potential

customers over a one year period and obtained most of the

customer letters of intent for millions of dollars of potential cement

sales and distribution shown in U.S. Cement's business plan

(Plaintiff's Attachment 18, pages 27960-64)

Scott Woods.  Experience salesperson called on potential San

Francisco and Sacramento area cement

customers for six months.  Expenses: approximately $15,000.

Commissions.  No base salary.

Ron Bill.  Experienced business development manager in

Indianapolis that made introductions and held

Numerous meetings and phone conversations for potential sales of

cement in Illinois and Indiana.

Expenses: Approximately $6,500. Commissions. No base salary.

iv.   U.S. Cement paid $1,000 to have different cement samples tested by US test laboratories and compared to competitor's cement samples in Las Vegas.

v.   Mr. Stockett and his staff solicited hundreds of potential customers to purchase cement, by telephone calls, email, written proposals, and personal visits by Mr. Stockett, Dale Olive (Las Vegas), John Oswald (Montana later Las Vegas), Cort Hooper (Southern California) and Scott Woods (Sacramento), Ron Bill (Indiana) and Craig Longhurst (Houston)

vi.   U.S. Cement obtained letters of intent to purchase cement from five U.S. distributors (Attachment 18 pages 27960-64)

vii.   Mr. Stockett obtained a valid purchase order from All Star Transit Mix for $5.6 million for one year contract (Seized by FBI) and submitted the purchase order and All Start's financial statements to Actrade Finance (New York) and other to obtain purchase order financing. Their credit was declined even though they had $18 million in annual sales and regularly purchased over $6 million in cement per year.

viii.   A prototype 10 ton cement bag (similar to one pictured on web site) was manufactured by SEEC Corporation and tested in Las Vegas by U.S Cement. US Cement planned to purchase these bags with

financing that was to be promised by Inter Oil Gulf and Akropolis Ventures. While no bags were purchased or used, the plan remains valid to this date and the company is continuing to seek partners and financing to implement its unique cement business plan.

ix.     U.S. Cement had sample 1 ton and 2 ton bags manufactured by Bag, Inc. and two other suppliers. These bags were sent to Las Vegas for testing and used to demonstrate the bulk bag concept to potential cement suppliers. While the pictures of cement shown on the company's web site contained pictures of the same bags tested by the company, the actual pictures on the web site were provided by SEEC (the manufacturer), and pictures taken at two of the companies we negotiated letters of intent to acquire. These pictures were not shown to mislead investors. They were shown on the web site to demonstrate that the bulk bags we were proposing to use for our business were already being used by companies we were planning to do business with. The text associated with the business plans, brochures, and web site never made any false claims regarding the bags pictured.

x.      Mr. Stockett, Dale Olive, John Oswald and Cort Hooper all were extensively involved evaluating, due diligence and in negotiating and making legitimate business proposals and letters of intent to acquire all four known cement distributors in the U.S. that utilized

bulk bags for importing cement from China, Mexico, Thailand, and
Indonesia, including:

1. Universal White Cement proposed acquisition– Fell through
when Inter Oil Gulf Financing fell through

2. Whitestone White Cement – Proposed acquisition – Fell through
when IOG financing fell through

3. Key Enterprise proposed acquisition – Advanced $20,000 down

4. payment on acquisition.

Converted to $20,000 inventory of cement including 3,000 bags
of white cement delivered imported
from United Arab Emirates in two-ton slings demonstrating
viability of U.S. Cement's proposed
bulk bag system.

5. UPD Cement (Huston cement importer/distributor) proposed
acquisition – Acquisition fell through.

xi.   All Star Transit Mix – Proposed acquisition of Las Vegas Ready
Mix Concrete company with $18 million in annual sales.  Stock
swap – fell through after cash offer from another buyer.  US
Cement did obtain purchase order for $5.6 million of cement but
was unable to obtain purchase order financing.  US. Cement
brought numerous investors to visit All Star over a one year period
of time that company was attempting to acquire All Star and
attempting to obtain financing for their legitimate purchase order.

  xii.  Majestic Crushing. Hightec acquired company. Cort Hooper managed Majestic Crushing for Hightec for four months. Company failed for failure of major customer to pay invoices for services rendered. This company had over $1 million in assets and generated $30,000 in monthly billings during the time US Cement Company managed it.

B. Development stage activities associated with legitimate business plans for the development of a manufacturing

Plant to manufacture Basalt Fiber products for the cement industry. (Attachments 19 & 20) This business plan and operational efforts are a continuation of the US Cement business plan involving the importing of basalt fibers to be used as an additive to imported cement to make a cement product that would be more resistant to cracking than ordinary Portland cement. The legitimate business operations currently being conducted by the company over the past seven months and continuing to this date include:

  i.  Evaluating all previous attempts to manufacture continuous basalt fiber in the United States, Ukraine, and Russia, including claims of Jim Medwid, Bruce Teter, and other spin off groups from Wooding Industries (bankrupt company that built basalt fiber plant in New Jersey).

  ii.  Obtaining samples of basalt fiber manufactured in Ukraine, and Russia.

iii.    Providing samples of basalt fiber to potential customers and distributors for their testing and evaluation.

iv.    Obtaining agreements and oral understandings to purchase basalt fiber for resale from Jim Medwid, and his suppliers (Albarrie, Canada), and their supplier Ukrainian Technical Institute.

v.    Obtaining samples of basalt fiber re-bar from South Dakota School of Mines imported from Russia.

vi.    Obtaining letters of intent with ConRoc to distribute basalt fiber to their cement customers.

vii.    Obtaining joint venture agreement with European company that is 50-50 partner with Ukrainian Technical Institute for the manufacturing process to manufacture continuous basalt fiber and to obtain a supply of up to 40% of their international production capacity for import to the United States.

viii.    Evaluating and visiting all known operating basalt mines in Nevada and California. Obtaining samples of basalt from Peter Kewit of over ten different basalt mines.

ix.    Sending the promising basalt ore for chemical analysis and testing to the University.

x.    Obtaining all published research and test reports evaluating basalt fiber for use in concrete and rebar applications.

xi.    Negotiating joint venture with Can Cal Resources to build a basalt
       fiber manufacturing plant on their reserves of over 4 million tons
       of crushed, screened basalt.

xii.   Negotiating mining agreements with Southern Nevada
       Lightweight to mine basalt on their existing mining claims 8 miles
       south of Las Vegas.

xiii.  Contracting for commercial feasibility study for visitor's center to
       be built out of basalt fiber construction materials.

xiv.   Developing plan for mining basalt on 15,000 acres of federally
       owned land under Bureau of Land Management (BLM) mining
       claims.

xv.    Making presentations to the Clark County Planning Commission

xvi.   Writing a private placement offering memorandum to obtain $5
       million to build basalt plant.

xvii.  Running ad in Wall Street Journal to obtain loan or partner to
       build basalt plant.

xviii. Evaluating and following up on all leads generated from
       legitimate loan requests.


C. Development of legitimate business plans for the refurbishment and operation
   of a Rail hotel in Las Vegas, to be relocated from Wilkes Barre Pa. Sinclare
   Group Inc. acquired and maintained ownership of Market Street Square rail
   hotel consisting of 40 rail cars located in Wilkes Barre, Pa. The company

spent over $30,000 cleaning and relocating 16 train cars to a train restoration facility in Pitston, Pa. The company spent $9,000 obtaining an independent appraisal of the assets by Best Appraisals, Inc. They appraised the assets owned by the company at its highest and best use relocated to Las Vegas of $6.9 million. The liquidation value of the assets was $320,000 shown in Defendant's attachment 3 summary page from Appraisal by Best Appraisals. Defendant paid $9,000 for appraisal of assets by independent appraiser recognized for rail assets by most major banks.

D. . The company owned these assets for one year until we defaulted on our obligation to move them off of the property within one year. The company still believes it is possible to reinstate the defaulted agreement and has tried on several occasions to raise the funds necessary to move the remaining assets to the restoration facility and commence restoration of the assets. The company solicited all of the major casinos, Convention and Visitors Bureau, Governor's Office, Mayor's Office, and other groups to obtain approvals and obtain financing for the train hotel and a proposed dinner train acquisition after the Sept. 11 crisis. These efforts are all legitimate business efforts of Sinclare Group and its subsidiaries and are ongoing to this date.

Personal loans and investment in 2000 of over $500,000 cash (assets)

into the US  Cement (subsidiary of Hightec), (Attachment 18, page

027869)

Owned cement inventory  with $20,000 cost (2,000 bags of

white Portland cement),

Revenue from sale of cement of $3,000 to a bonefide customer,

Valid purchase orders issued in 1999 for cement in excess of $5.6

million with All Star Concrete,

Valid letters of intent to purchase cement from several distributors

Valid supply agreements entered September 6, 2001 providing for

purchase of cement with TPI Polene, Public, a multi-billion

supplier, for $27 per ton FOB Thailand, with a market price in

excess of $80 per ton in Las Vegas, NV.

(Defendant's Attachment  6)

On page 19 of the Chan Declaration, she admits that she was provided undisputed

evidence that U.S. Cement had an inventory of 3,000 bags of cement,, and that U.S.

Cement had revenue from selling these bags of cement to a distributor.  These bags

represent inventory and revenue and her false press release and false statements in her

complaint claim that Mr. Stockett's companies had no inventory, no revenue and that Mr.

Stockett conducted no legitimate business.  In light of the evidence to the contrary in their

possession, the SEC made blatantly false statements in their complaint and they repeated

these false and misleading statements and omitted material information regarding these

statements in the press release.  Mr. Stockett and his staff including Cort Hooper, John

Oswald, Dale Olive, and Scott Woods made legitimate business calls for over a year on

cement users and distributors throughout California, Nevada and Utah in their legitimate

attempts to obtain purchase orders, distributor agreements, and letters of intent that would

allow Mr. Stockett to obtain the financing to import cement in bulk from Asia. Copies of

the business cards personally obtained by Mr. Stockett in meetings with potential

customers from over one hundred legitimate sales calls were provided to the SEC and

completely ignored in their complaint allegations and false press release that stated Mr.

Stockett conducted no legitimate business for three years. Copies of legitimate purchase

orders for $5.6 million in cement from All Star Transit Mix, and copies of letters of intent

to purchase cement and basalt fiber from ConRock Distributors and other potential

customers were contained in the business plans of U.S. Cement and Basalt Fiber

Industries delivered to the SEC under sworn discovery and depositions.   Copies of fully

executed agreements for $20 million financing promised by Inter Oil Gulf and  $20

million financing promised by Akropolis Ventures were also provided under discovery

by the SEC.  These examples of legitimate business proposals and pending transactions

that were dependant on promised financing from Inter Oil Gulf, Akropolis Ventures and

others  were also contained in the documents seized by the FBI.  By ignoring the

hundreds of documents and email messages that documented the legitimate business

transactions, proposals, efforts to obtain financing, etc., the SEC has built a case that only

contains the selective information they feel tells their side of the case while ignoring

hundreds of documents that contradict and disprove their most damaging allegations.  For

the SEC to claim that there was no legitimate business conducted by Mr. Stockett after

reviewing hundreds of documents, hundreds of emails and thousands of pages of business

plans, proposals, communications with legitimate potential customers, financing sources,

staff, suppliers, etc., is simply impossible to explain.  There are no smoking guns.  There are no letters or documents containing fraudulent claims.  These are business plans and work product prepared by hard working, intelligent, experienced people with years of experience in their industries and the SEC has simply ignored their work product and alleged that since they were not successful to date they must be a scam.  If the company had received the financing it was promised in writing by Inter Oil Gulf and Akropolis Ventures, Mr. Stockett would be an example of a brilliant business strategy that allowed him to become a leading distributor in the cement industry.  The SEC complaint and false press release and false allegations omit all of the material facts that would allow the public and any future potential customers of Mr. Stockett's companies to reach an informed position as to Mr. Stockett's guilt or innocence.

The SEC has committed the same violations that they allege against Mr. Stockett regarding false press releases.  They claim, No assets.  No revenue.  No legitimate business.  They make false claims about profits from stock sales without taking into account Mr. Stockett's costs for his stock that far exceeded his sales of stock.  These facts are proven false by the written declarations made by Kelli Chan and submitted with the complaint.  Her mistaken logic can not even give credit for $300,000 cash Mr. Stockett paid by court order to avoid a sheriff's sale of his stocks and other assets.  She further admits that her false statements in the complaint and press release were based upon a review of all of Mr. Stockett's documents that she obtained without due process from the FBI under their criminal search warrant.

Since 1999, Mr. Stockett has only issued press releases that documented actual transactions that were accomplished by the company or agreements or letters of intent that were entered into by the company. Mr. Stockett has provided copies to the SEC of the documentation that supports each and every press release issued. Mr. Stockett relied on the representations of the parties that entered into these agreements, and was unaware at the time they were issued of any false or misleading information contained in the press releases.

Mr. Stockett's web site does not contain any false or misleading information regarding the assets, or financial condition of the company. The income prospects of the company are the best estimates of the company and have been prepared and documented with the inputs of outside consultants, appraisers and experts in their fields. There is no proof that the income prospects for the company are false or misleading. Adequate disclosure statements are provided on the web site as to the risks, lack of available financing, and fact that Mr. Stockett has had failures in his past.

The SEC has issued a false and misleading press release claiming Mr. Stockett has had no assets, revenue, or legitimate business activities for the past three years and claiming that he has made over $800,000 in profits from stock sales, and the SEC has failed to disclose to the public in their press release that Hightec is a holding company and the wholly owned subsidiaries of Hightec all are validly existing and had revenues, assets, and conducted legitimate business during the periods claimed in their press release. They also failed to disclose that Mr. Stockett had over $2 million in stock purchase costs, and

failed to deduct his costs from his sales and thus claimed false profits made by Stockett

from his alleged illegitimate business practices. This blatant disregard for the facts and

documents provided by Mr. Stockett has had the effect of declaring Mr. Stockett guilty

until proven innocent and has destroyed Mr. Stockett's credibility with his customers,

potential customers, investors, shareholders, and business associates. Mr. Stockett

believes that this irresponsible press release was issued as a punitive response to failed

negotiations to reach a settlement of the SEC's allegations after weeks of negotiations

between Stockett's attorney and the SEC. By blatantly disregarding the facts and

documented evidence, the SEC has caused irrevocable damage to Mr. Stockett's

credibility and the SEC should be required to immediately issue a supplemental release or

clarification of their grossly unfair and untrue statements. Any other appropriate

sanctions should be considered for the SEC attorneys that used attorney client privileged

documents obtained by the FBI without proper notification to Mr. Stockett's attorneys or

due process.

2. Mr. Stockett has provided documents and spread sheets that have not been rebutted by

the SEC that he has personally invested in excess of $2,000,000 into the IPO Network,

and US Cement subsidiaries of Hightec since their inception to date. He has also

documented that the approximate $800,000 of stock sales made in 1999 and early 2000

were approximately the same as the $300,000 paid for 6.7 million shares of Hightec and

the $500,000 invested in cash into US Cement during the year 2000. Mr. Stockett has not

made any profit from the sale of Hightec shares, and owes personal loans in excess of $2

million and has collateralized his loans with his personal stock of Hightec. The SEC has

blatantly ignored Mr. Stockett's costs of the stock sold and therefore falsely claimed profits that were never generated. There are no profits to disgorge.

Hightec is a development stage company and has less than $10 million in assets and minimal revenue. It was Mr. Stockett's understanding from information posted on the SEC Edgar web site that Hightec was not required to file reporting and that Hightec and Sinclare are non-reporting companies listed on the Pink Sheets. Not once in the many conversations, meetings, depositions, and correspondence with the SEC over the past three years has any SEC attorney or judge stated that Hightec or Sinclare needed to file reports or failed to file reports. No request to file reports was issued and no letter stating that such reports were required was ever submitted to Mr. Stockett or his attorney by the SEC or any SEC attorney that reviewed his cases.

    3.    Same response as paragraph 1.

    4.    Mr. Stockett has not offered any stock for sale or sold any Hightec or Sinclare stock since 1999 and early 2000, after which time Mr. Stockett invested $800,000 into the purchase of Hightec shares and investment into US Cement. A permanent restraining order would in effect put Mr. Stockett and Hightec out of business depriving him of the opportunity to make any profit on his investment of over $2 million and depriving all shareholders of Hightec or Sinclare from ever obtaining any benefit from their investments. The facts and documents presented by Mr. Stockett demonstrate that Mr. Stockett should obtain equitable relief from the violation of his evidentiary rights and the

false and misleading press releases and the blatantly false claims made in the SEC
complaint ignoring the hard evidence provided by Mr. Stockett in discovery and sworn
depositions.

   5. The preliminary and permanent injunction should be denied on the basis of the
undisputed documentation of the assets, revenues, historical cost of stock to Mr. Stockett,
valid contracts, valid purchase orders and legitimate business transactions of the
subsidiaries of Hightec. The Commission should be required to issue a press release
correcting the false and misleading  information contained in their press release
considering they had no evidence to the contrary that these documents were not true,
correct, and valid. They should admit that they omitted the fact that they had evidence
and documents that undisputedly proved that Mr. Stockett's companies had significant
assets (over $500,000 cash at one point), some revenues, legitimate supply agreements
with very favorable prices, and attempted to conduct legitimate business with hundreds of
legitimate potential customers in the cement industry.

According to the Las Vegas Sun on April 29, 2002, they claim the SEC raided Stockett's
house and collected documents. Obviously the SEC provided this information to the
newspapers.  On March 29, 2001 the FBI (not the SEC)  did search and seize records of
Mr. Stockett using a Search Warrant MAG.01-2083-M-PAL. During depositions of Mr.
Stockett conducted by Kelli Chan of the SEC, Denver, the SEC admitted that they were
questioning Mr. Stockett based upon documents derived from Mr. Stockett's personal
computer seized by the FBI. The SEC was conducting a civil administrative hearing with

no complaint against Mr. Stockett and illegally obtained information from the FBI that violates Mr. Stockett's evidentuary rights.  The FBI has not charged Mr. Stockett with any criminal complaint and it is questionable whether they ever had valid grounds to obtain a search warrant in the first place. The search warrant alleged a stock fraud investigation and the FBI has not charged Mr. Stockett or made any finding of any evidence of any stock sales, boiler room, stock manipulation or other stock fraud being conducted by Mr. Stockett or any illegal activities of Mr. Stockett emanating from his residence either before, at the time of, or one year after obtain the search warrant and conducting the questionable search and seizure.  Why bother to subpoena or deposition Mr. Stockett if the SEC can simply ask the FBI to search his home, copy all the files on his computer, and turn them over to the SEC for their complaint?  The complaint further makes reference to Mr. Stockett's personal documents from his personal computer that were prepared for such depositions to discuss the allegations of the SEC with Mr. Stockett's attorney.  The facts clearly demonstrate that the SEC has violated Mr. Stockett's rights to attorney client privilege and are using his own documents prepared for his defense as purported evidence of his state of mind and potential violations that he could be charged with.  This blatant, outrageous behavior should be grounds for sanctions against the attorneys involved and for dismissal of the complaint, and dismissal of the order being sought for preliminary and permanent injunction.

## II.      JURISDICTION AND VENUE

6.  The SEC does not have jurisdiction over criminal matters. If they turn the matter over to the Attorney General for criminal prosecution, the records seized in a criminal investigation by the FBI should not be turned back over to the SEC without proper requests, due process and the opportunity for the defendant to object to the information that was seized being used, especially if it involves attorney client privilege.  The SEC has relied upon attorney client privileged information prepared by Mr. Stockett for communications with his attorney for response to depositions in a civil administrative matter with the SEC.  Such information was obtained by the SEC from a search conducted by the FBI under a criminal search warrant that apparently was requested by the SEC in blatant violation of Mr. Stockett's rights and the SEC's lack of jurisdiction over criminal investigations. Conducting the case in Las Vegas, rather than Denver, Colorado deprives Mr. Stockett of the legal counsel that has represented him for the past year during which time the SEC deposed Mr. Stockett for a total of five days. Thousand of pages of documents have been reviewed by Mr. Stockett's counsel and hundreds of documents have been submitted to the SEC under discovery.  Mr. Stockett's attorney was negotiating with the SEC to hold any law suit in Colorado when the SEC filed the suit in Las Vegas.  Mr. Stockett requests that the complaint be denied and re-filed in Colorado so that he can continue with his current counsel.


7.  Same response as paragraph 6.

III.     THE DEFENDANT AND RELATED ENTITIES

8. Mr. Stockett has consented to three consent decrees on three separate federal and
state cases alleging securities violations over the 17-year period that he has been an
officer and director of six public companies. In each of these cases the complaints were
settled without trial and without admitting or denying any guilt by Mr. Stockett. None of
these complaints were cause of any shareholder to lose money and none of them alleged
that Mr. Stockett was unduly enriched by the false or misleading information contained
in the prospectus, or press releases. To brand Mr. Stockett as a recidivist securities
violator is a claim or admission of guilt where no guilt was ever proven or admitted. The
Hudson Investors Fund case that did go to trial is still under appeal after three years with
no effort or action on behalf of the SEC to rule on the appeal. The SEC was unable to
prove any of the 27 claims in their complaint at the trial, and has failed to rule on the
only violation found to be upheld by the SEC administrative law judge. The fact that the
ruling by the judge that Mr. Stockett aided and abetted the Hudson Fund in their failure
to disclose his relationship is in direct contradiction to the other facts that Mr. Stockett
was not in control of the fund or control of their reporting serves as the basis of the
appeal. The fact that there is no evidence in the trial transcripts to prove the SEC case is
the reason that no decision has been reached on the appeal. The defendant feels strongly
that the SEC is searching and asked the FBI to do their fishing for any new securities
violations in order to vindicate their failure to prove that Mr. Stockett violated any
securities laws in the Hudson matter. Mr. Stockett requested a $20 million counterclaim
for their failure to prove their complaint, and that the SEC issued similar false press

releases in the Hudson case alleging 27 counts of fraud that they could not prove. The
Hudson Fund lost all of its clients and assets shortly after the SEC press release. The
SEC never corrected the press release after the trial and never issued any clarification
that they were unable to prove the 27 claims in their complaint and only issued one
aiding and abetting violation that was contradictory at best to the other conclusions
reached in the trial.

9.  Mr. Stockett was told on several occasions by two or three SEC attorneys that as a
development stage company listed on the pink sheets that Hightec and Sinclare were not
required to file annual or quarterly reports with the SEC. The SEC web site states that
companies with less than $10 million in assets are not required to be reporting
companies.  In years six years of dealing with the SEC, not one SEC attorney has ever
stated or requested that Hightec or Sinclare was required to file quarterly or annual
reports. Mr. Stockett relied on this information and was not aware that such reporting
was required, if in fact it is. If Mr. Stockett failed to file a report requesting to be a non-
reporting company, no one ever told him such report was required. Given the on-going
nature of the investigation and the numerous depositions conducted by the SEC, this
should have been brought to Mr. Stockett's attention before this complaint.
The taxes owed were Delaware franchise taxes. There were no corporate income taxes
due or owned. Mr. Stockett wrote a check for $6900 to Akropolis Ventures and made
them the registered agent for the Stockett Group of Companies. They paid the franchise
taxes and reinstated all of the Nevada Corporations, including U.S. Cement Company and
the IPO Network. They did not pay the Delaware Franchise taxes and Mr. Stockett was

unaware of this. He was unaware until recently that Hightec and Sinclare had lost their status because of his failure to pay their franchise taxes. (A few hundred dollars per year, when calculated based on the assets of the company).

Mr. Stockett invested over $2 million cash into companies acquired by Hightec. He certainly did not fail to pay the franchise taxes intentionally. It was simply an oversight on his part. Mr. Stockett has never denied the corporate status after he became aware that the corporate charters were revoked.

10. Same response as paragraph 9.

## IV. VIOLATIONS OF THE FEDERAL SECURITIES LAWS

11. Stockett denies that the press releases were false or misleading at the time they were issued. Stockett issued each press release to notify the public of actual agreements, letters of intent or contracts entered into between the companies and third parties.

12. Stockett did not disseminate 10,000 copies of a promotional brochure. In fact Mr. Stockett disseminated less than 1,000 copies of a promotional brochures regarding U.S. Cement. Stockett never received more than 1,000 leads from all infomercials.

13. Stockett owned Hightec shares for over six years and only sold Hightec shares during a 15 month period when he also invested $800,000 cash into Hightec and its subsidiaries. If Mr. Stockett was going to conduct a stock fraud or pump and

dump scheme, he certainly would have sold some of his personal stock at times
corresponding to when the press releases were actually issued or right after the
television show infomercials were aired. A review of all of his stock accounts
and transfer agent's reports document to the SEC that this was not the case.

Stockett has disseminated approximately 20 copies of its business plan relating to an
offering of Basalt Fiber stock. All copies were distributed to corporations, accredited
investors, or business consultants that claimed to have clients that could participate in a
$5 million private placement.

13. The claims made by Mr. Stockett on the October 2000 show were not false or
misleading. Mr. Stockett has run many companies with very significant sales and
growth.

Mr. Stockett has had lots of firsts in the industries that he has chosen to pursue. Mr.
Stockett was chairman of the board and majority shareholder of Austin Equities that
acquired National Self Storage and U-Lock-It Self Storage. These companies owned in
excess of $200 million in real estate assets consisting of over 100 self-storage properties.
Mr. Stockett has a scrapbook with over 2,000 newspaper and magazine articles written
about his accomplishments. Mr. Stockett did not claim he worked 18 years as a $2
billion a year government contractor. Mr. Stockett responded to a message about a
person who claimed to work 18 years as a government consultant. Mr. Stockett claimed
he worked for SAIC as a Vice President of SAI Comsystems over 18 years ago. Mr.
Stockett stated that SAIC then had over $2 billion in sales. Actual sales are now over $6

billion.  Mr. Stockett submitted a proposal for financing for Hightec to SAIC.  There was nothing false or misleading about Mr. Stockett's posts on the Internet.

14.  The long description of Stockett's credentials on the web site is true and documentation that was requested has been provided to the SEC and at the Hudson Trial. Mr. Stockett has had an IPO radio show in 70 markets for 26 weeks, an IPO television show appear nationally for 26 weeks, an IPO web site with millions of hits over a three year period,  and published hundreds of thousands of copies of his IPO research in 15 editions of nationally distributed magazines including the Opportunist and the New Industrialist.  Mr. Stockett conducted 26 seminars attended by hundreds of individuals to learn about IPO stocks.  Mr. Stockett has been considered a leading expert in the field of IPO information by members of the media including the the nationally distributed Opportunist and New Industrialist magazines that published his research free of charge.

Mr. Stockett's state and federal consent decrees and complete regulatory history has been posted on SEC Edgar since 1996 for any investor.  They can be found listed under Hightec and are contained in the Form 13-D and Form 8-k filed when Mr. Stockett acquired control of Hightec.

15.  Stockett was unaware of the defunct status of Hightec and Sinclare until it was pointed out to him by the message posted on the Internet a few weeks ago.  Stockett has not made any further statements or any press releases or any comments in any public statements since he became aware of the information.  At no time during any of the press

releases or updates to the web site, or in any public statement has Stockett made false or misleading statements regarding the company's corporate charter or corporate status. Mr. Stockett was simply unaware that the corporate charter had expired for failure to pay Delaware franchise taxes of a few hundred dollars. Mr. Stockett believed that such taxes were paid when he paid the registered agent and the registered agent reinstated U.S. Cement company but failed to reinstate the partent holding company, Hightec.

16. The SEC falsely claims that Mr. Stockett took no steps to conduct due diligence concerning Inter Oil's ability to provide financing. Mr. Stockett requested and received audited financial statements, sent representatives to London to meet with them, visited them in London and Hong Kong to meet with their financial sources and conducted extensive due diligence. Mr. Stockett provided this to the SEC over two years ago and now they are making false claims in their complaint.

17. Stockett did invest $500,000 cash into U.S. Cement. There was nothing false or misleading about the press release. Stockett provided copies of the bank statements and letters from the Vice President of Wells Fargo bank documenting the investment of the funds into U.S. Cement. There was nothing illegal nor was it a misappropriation of funds for Mr. Stockett to use company money to make a down payment on a house for the Company President (over $150,000 of the $200,000 was subsequently refinanced and Mr. Stockett utilized the refinancing to continue to pay company bills). The house was the office of the company. There was nothing illegal about using $50,000 cash to purchase a new car for Mr. Stockett as the company President. The car was subsequently exchanged

for a new car and $34,000 cash back was refinanced and used to pay other company expenses. To claim misappropriation of funds is absurd, especially since Mr. Stockett had not received any salary or compensation for over four years from the company and was owned expense reimbursement from the company for bills that he had paid personally for the company over a two-year period when the company had no funds. The funds that were going to be used to make a short-term loan to purchase a boat for resale and quick profit were returned and the funds were reused by the company.

18. This statement regarding the August 23, 2000 press release by the SEC is completely false. Mr. Stockett never admitted under oath that he fabricated a claim of $2 million additional investment being finalized. Mr. Stockett was assured by Akropolis Ventures that they would provide the $2 million down payment investment for the purchase of the proposed US Cement distribution facility in Las Vegas.

19. The press release was accurate at the time it was issued. Mr. Gene Isaacs claimed he would provide $5 million of equity financing for Basalt Fiber Industries in exchange for 40% ownership. He was issued the shares. He claimed he would receive $50 million from the sale of his mining property before February 1, 2002. He later changed the closing date to February 7, Feb. 14th, and then disclosed that the sale did not materialize. On February 7, 2002 when the second press release was issued, Mr. Isaacs had already invested in excess of $50,000 cash. He promised to pay $50,000 per month for at least two more months, and promised to invest $5 million when his property sold. He told this promise to many individuals. A list was provided to the SEC. The press release did not

claim that $5 million or $15 million was received. The only funds required for the commercial feasibility study was $6,000. $64,000 required for additional consulting was to come from the $50,000 per month promised by Mr. Isaacs. He breached his oral agreement to provide this money even though he met every obligation on a written spreadsheet for the first thirty days of the agreement. He breached his continuing obligations approximately 45 days after entering into oral agreements with Stockett and after making over 15 agreed upon payments on his credit cards and with cash.

20.   The acquisition of Majestic Crushing was consummated. Hightec employees including Cort Hooper, Vice President of US Cement managed Majestic Crushing for four months before they went bankrupt because their clients failed to pay their bills. Certain conditions of the acquisition were not met and until they were met, the stock was not issued. The transaction and the press release were valid at the time they were issued.

21. Stockett never issued any false press releases related to any acquisitions. Messages on Internet bulletin boards are not public disclosures. They are simply responses to other Internet posters. Mr. Stockett was not required to issue complete disclosure information or any information in response to hostile messages on the Internet. Responses to messages on the Raging Bull are not considered public press releases.

22. Stockett took all steps humanly possible to determine whether the public press releases provided to him by Inter Oil Gulf were true. Stockett received hundreds of pages

of documentation that were provided to the SEC over two years ago regarding the Inter

Oil Gulf contracts, and claims in the press releases they prepared and Stockett issued.

Stockett sent a shareholder and representative, Rod Allman to London to meet with

InterOil Gulf prior to any contracts or press releases. Rod Allman invested over

$160,000 of his own money and two other Hightec shareholders into Inter Oil Gulf to pay

for letters of credit and confirmed to Stockett that Inter Oil Gulf was real and going to

provide over $20 million in financing. Stockett traveled to London and Hong Kong with

Rod Allman to meet Inter Oil Gulf and to verify the validity of the contracts and

financing.

23. At the time of the appearance on the infomercial, Stockett had a signed letter of

intent to acquire an existing cement distribution company that already had distribution of

white cement on a national basis. US Cement intended to distribute bulk cement in bulk

bags though this existing national distribution network. The acquisition was dependent

on receiving the financing from Inter Oil Gulf. When the financing fell through, the

acquisitions fell through. The press releases were accurate at the time they were issued

and the information told on the television show was accurate at the time the show aired.

24. US Cement had a valid purchase order from Patio Industries to distribute 7,000 tons

of cement to Home Depot, Home Base, and Lowes. The statements were true at the time

they were made. US Cement failed to obtain the financing that was already committed

by Inter Oil Gulf in writing at the time the statements were made. When the financing

was not provided and the cement that was promised to be shipped by Inter Oil Gulf was

not shipped, the orders fell through.   The press releases were believed to be accurate and the validity of the contracts in China was believed to be accurate at the time they were issued.  There was $400,000 of cement shipped from China to San Diego that had not been paid for by Universal or Whitestone White Cement.  US Cement had an agreement to pay for this cement and release it to Universal and Whitesone White cement making US Cement the importer and Whitestone the distributor.  We had an agreement to acquire Whitestone.  US Cement also had agreements with Chip Boyd, owner of the warehouse and ship handling company in San Diego that was holding the inventory of cement with instructions not to release it until paid for.  We waited for two days to pay Universal and Whitestone $400,000 for the cement in September 2000 and they changed their mind after their other cement suppliers put pressure on them for doing business with U.S. Cement.

26. Stockett admitted that the photos were taken as part of the due diligence to acquire the company's cement that was shown in the photos.  Stockett had written agreements and letters of intent to acquire these companies.  These photos were posted on the Internet to show that bagged cement could be delivered in bulk bags.  There was no claim that these bags belonged to U.S. Cement.  There was nothing false or misleading on the web site.  The business plan clearly states that the bags are proposed to be used. US Cement did receive 10 ton bags from SEEC and tested the bags.  US Cement also received 2 ton bags to demonstrate the bulk bag cement concept to potential customers.  The pictures were posted to show potential US Cement customers the concept of delivering cement in bulk bags.  This concept had not previously been done in the United States.  US Cement

36

though its employees, Larry Stockett, Cort Hooper, John Oswald, Scott Woods and Dale Olive called on over 100 potential customers and made many presentations to sell cement. For the SEC to claim that there was no legitimate business, no operations, no revenue and no assets is simply false. US Cement has planned an import business for over three years, has operated a marketing company attempting to pre-sell cement, and has made hundreds of proposal to obtain financing for its proposed import and distribution business. Just because we failed to obtain adequate financing does not mean that the company did not conduct legitimate business and the SEC complaint unfairly and untruthfully tarnishes the reputations of all of the people that have been involved in this legitimate sales organization over the past three years.

27. The press release issued regarding the Volcanic Rock and Roller Process was not false or misleading. While the initial information and technology described came partially from a third party, Bruce Teter, who claimed to own the Beachwood process for manufacturing basalt fiber, the relationship with him was terminated approximately December 20, 2001. Subsequent research efforts by Mr. Stockett identified additional sources of design, engineer and hot rolling mill suppliers in the steel industry that claimed they could produce a roller process for manufacturing continuous filament basalt fiber. Until December 20, 2001 Mr. Teter was included in the business plan as the proposed VP of manufacturing for the company. Subsequently the business plan was changed, his information removed from the business plan, and the company name changed and the company was incorporated as Basalt Fiber Industries, Inc. Subsequently Mr. Stockett has executed a Memorandum of Understanding with the world's leading

manufacturer of continuous filament basalt fiber. Mr. Teter's testimony to the SEC does not have any knowledge of the subsequent research or supplier agreements reached by the company after December 20, 2001 when the relationship with him was terminated.

28. The web site never claimed that we had used the bulk bags pictured in the photos. The bags were made and provided by the US Cement proposed supplier. US Cement showed pictures of the bags that were proposed to be purchased for the business. U.S. Cement did receive one bag from SEEC Corporation holding 10 tons of cement that we tested in Las Vegas. The web site does not make any claims of sales or usage of bags. It claims we have a strategy to distribute cement in bulk bags that do exist and are capable of being used for the business plan if we receive the financing we have been seeking for the past three years.

The fact that US Cement has failed to receive adequate financing to implement its business plan does not prove that it did not conduct legitimate business during the time frame that it was marketing its concepts in order to receive purchase orders. All of the financing sources requested purchase orders, so we attempted to obtain purchase order in order to obtain the financing. There was no fraud intended and hundreds of thousands of real dollars were expended in the sales and operations of US Cement.

29. At the time the press release was issued, Sinclare owned the assets shown in the photographs. Sinclare spent of $40,000 cash cleaning, and moving 14 of the train cars from where they were purchased in Wilkes-Barre, PA to a restoration facility in Pittston,

PA. The assets were appraised by Best Appraisals of Louiville, KY and a valid appraisal was issued stating that the assets has a highest and best use value of $6.9 million. This appraisal was given to the SEC and was valid at the time the press release was issued. The fact that we only had one year to remove all of the assets from the site and were subsequently in default, does not mean that Sinclare had no assets at the time the press release was issued. For the SEC to claim that Sinclare had no assets over the three year period since 1999 is false and misleading. The assets are still sitting in the same place and still available to Sinclare if it is able to raise the funding required to reinstate the agreement. Sinclare tried again after September 11, 2001 to obtain equipment financing to purchase and restore the trains to address the market for people traveling between Los Angeles and California that did not want to travel by air. The proposals made to all of the Las Vegas Casinos, the Governor of Nevada, The Mayor of Las Vegas, the Visitors and Convention Bureau and other organizations were valid and legitimate business conducted by the subsidiaries of Sinclare, Primm Valley Transit Authority. To claim that Sinclare did not conduct legitimate business is a false claim by the SEC. We were not successful in obtaining the financing but that doesn't mean the business, marketing and efforts to obtain equipment loans against the assets that we desired to acquire was not legitimate.

30. The web site clearly states that these projections are subject to obtaining financing. The projections are not false and misleading. They were prepared by Jim Medwid who has spent over 6 years marketing and manufacturing basalt fiber. He was the vice president of Wooding Industries that built a basalt fiber manufacturing plant in New

Jersey and went bankrupt two years ago. Mr. Stockett relied on his business plan and projections for raising money for Basalt Industries and Basalt Fiber Industries. Mr. Medwid is the Vice President of Sales and Marketing for Basalt Fiber Industries. Mr. Stockett is not relying on any technology or trade secrets of Mr. Teter and the web site is still accurate and does not claim any false or misleading statements with regards to basalt fiber technology or projections of revenue or earnings potential. The web site adequately discloses that the projections may not be achieved and that they are dependent on obtaining financing.

31. At the time the press releases were issued the information contained in the business plans and press releases were accurate. At the time of the infomercial US Cement had just received written copies of the financing commitments and Mr. Stockett relied on their accuracy and validity. Mr. Stockett provided the SEC with a complete chronology of the events associated with Inter Oil Gulf over two years ago. Why has it taken two years to file a complaint against Mr. Stockett unless the SEC simply is looking pile on as many allegations as they can to charge Mr. Stockett because they don't want to rule on the appeal of the Hudson case or don't want to pay $20 million in counter claims for their failure to prove the 27 claims in their last case against Mr. Stockett? The SEC's failed negotiations and efforts to intimidate Mr. Stockett into signing a consent decree that falsely accuses Mr. Stockett of 15 false and misleading press release, no assets, no revenues, and no legitimate business, and profits from stock sales without taking into account his stock costs, defies the facts and over 1,000 documents presented to the SEC in a series of depositions and FBI seizures. The SEC complaint and false press release

claims that Hightec and Sinclare have not conducted any legitimate business, not had any assets (forgetting about the $6.9 million appraised assets in trains, $20,000 inventory of cement, $500,000 cash assets), and not had any revenue (including hundreds of thousands of revenue in IPO Network, millions of revenue in Karate International, hundreds of thousands in assets and thousands of dollars of revenue in Majestic Crushing, and thousand of dollars of revenue in US Cement). The fact that the SEC got most of its information by the seizure of seven boxes of information by the FBI and attorney client privileged information from Mr. Stockett's personal computer should not be forgotten. The business plans of Hightec and Sinclare have not been dependent on any one source of funding. The companies continue to seek funding for their business plans and the companies continue to conduct legitimate business despite the damage caused by the unfair, untrue press release by the SEC. This will obviously be more difficult now because of the SEC's false press releases and not to mention the violation of Mr. Stockett's personal rights in the manner in which they obtained evidence and attorney client privileged communications that they are now itemizing and admitting that they obtained from the FBI in their declarations against Mr. Stockett.

32. The trading and price of Hightec stock may or may not have reflected the prospects for the company that were reported in the press releases. The press releases were accurate at the time they were issued. Mr. Stockett did not make any trades that corresponded with the dates or even shortly after the press releases. Mr. Stockett reinvested more money into the purchase of Hightec shares and the investment into US

Cement in 2000 and 2001 than the total of all his stock sales since he became President of Hightec and Sinclare over six years ago.

33. Pink sheet stocks trade on rumor as well as press releases. The stock trading of Hightec and Sinclare have changed many times over the past six years and many times when there were no press releases at all.

34. It is very significant that Mr. Stockett has only sold shares during a 13 month period between January 12, 2000 and February 2, 2001. He has owned over 40 million shares of Hightec since he purchased the first 8.7 million shares in 1996. The price of the stock has been as high as $5.75 per share. The fact that Mr. Stockett made no stock sales on or near the days of any press releases ought to demonstrate that there was no pump and dump scheme. The fact is that all of the money received by Mr. Stockett was either reinvested into the company, used to repurchase Hightec stock or used to pay Mr. Stockett's expenses for operating Hightec and its subsidiaries. Mr. Stockett has refinanced every asset he owns and sold most of his stock or transferred it as collateral for his loans to keep the companies afloat for the past six years. This is not a securities violation. Mr. Stockett held his stock for over three years before he sold any stock. Mr. Stockett worked full time for six years in Hightec without any compensation. Mr. Stockett borrowed over two million and invested it into Hightec, Sinclare, the IPO Network, Karate International, BAI, Primm Valley Transit Authority, Majestic Crushing, Market Street Square, US Cement and Basalt Fiber Industries. These were all legitimate businesses. Most of these companies had employees, assets, revenues, operations, and

expended significant efforts to raise financing and conduct legitimate business. For the SEC to claim otherwise is denial of thousands of pages of documents provided that demonstrate the business plans and efforts of these companies. Their false press release is an abuse of power. It is very difficult for a small company to raise significant amounts of capital required to implement such business plans. It is impossible when the government makes false claims and issues press release that their own declarations disprove. They have done this twice to Mr. Stockett. The SEC should correct their own false press releases before they sue Mr. Stockett claiming he has made false press releases. Mr. Stockett has been waiting almost five years since the SEC charged him in the Hudson case and was unable to prove 99% of their case or correct their press release regarding the allegations they could not prove.

35. Why has the government waited six years to claim that Mr. Stockett is required to file five years of back reports? They have sued him once and gone to trial. They have deposed him three additional times. They have sent him several additional subpoenas. Never once until now have they claimed he is delinquent on any reports or is required to be a reporting company. Mr. Stockett relied on previous counsel's advice and on the SEC's own website that Highec and Sinclare were not required to be a reporting company and therefore no reports were filed. If the SEC wants to criticize the accuracy of Mr. Stockett's website, perhaps they should look at their own web site as to the requirements for reporting companies. They omit any mention of reports that should be filed to become non-reporting. If a report should have been filed stating this, why doesn't the SEC have any responsibility to mention this to Mr. Stockett some time before they claim

he has failed to report for five years. Is this entrapment? Why don't they write a letter to Hightec and Sinclare stating that they are required to be a reporting company and citing the regulation that they be required to file five years back reports when their website says otherwise.

36. Mr. Stockett did not realize he was required to file such reports. Same comments as paragraph 35.

37-54. For the reasons stated above, the claims of the SEC should be denied. Mr. Stockett's personal rights afforded under the constitution have been violated. The SEC has used documents seized by the FBI and documents that were prepared specifically by Mr. Stockett to discuss his defenses with his attorney. The fruits of these documents that were illegally obtained by the SEC without notice or due process to Mr. Stockett's attorneys should not be allowed to be used now in a civil complaint against Mr. Stockett. On page 15 of the Declaration of Kelli Ferrand Chan she admits that in April 2001 she viewed the documents obtained by the FBI and she uses this and other references to documents obtained from the FBI in her Declaration and complaint.

## PRAYER FOR RELIEF

1.  The SEC complaint should be denied and discharged.
2.  The SEC should be required to issue a corrective press release to mitigate the damages they have cause to his reputation by their blatantly false and misleading

press release and omission of material facts in their possession that disproves their
claims that Mr. Stockett's companies had no sales, inventory, assets, legitimate
business and that Mr. Stockett made over $800,000 profits on stock sales.

3.   The SEC attorneys that used the FBI seized records should be censured,
     reprimanded, terminated or disbarred.

4.   The SEC should be required to rule on Mr. Stockett's appeal on the Hudson Fund
     case without further delay and without the benefit of any of the claims contained
     in this complaint because of the violations of Mr. Stockett's civil rights in the
     manner in which they obtained their evidence.

5.   The SEC should be ordered to pay financial restitution for the consequential
     damages of their irresponsible behavior in their false press release and false
     allegations in the complaint that they knew or should have known were false and
     that they would be unable to prove in any court of law.  There unsuccessful efforts
     to use these claims to obtain a consent decree simply turned into an abuse of
     power and a miscarriage of justice when they went from the allegation stage to the
     complaint stage given the overwhelming evidence that was presented by Mr.
     Stockett during his depositions that disproved their allegations.  The SEC should
     be denied an injunction against Mr. Stockett until and unless they have proven
     him guilty in a court of law.  Their complaint contains false allegations of no
     revenue, no assets, no inventory, no legitimate business and false profits that are
     not supported by the mistaken calculations and cited in their own declarations.

6. This case should be transferred to the District of Colorado where Mr. Stockett can be represented by the attorney that has represented him for the past two years and where the SEC has conducted all of their depositions of Mr. Stockett.

The undersigned Larry A. Stockett, verifies the truth of the foregoing under penalty of perjury.

_Larry A. Stockett_

Larry A. Stockett

Before me this date, Larry A. Stockett verified the foregoing and acknowledged first being of lawful age and duly sworn under oath has acknowledged his signature before me and notarized below.



State of Nevada   County of Clark
Nancy A. Byrd

    NOTARY PUBLIC
    STATE OF NEVADA
    County of Clark
    NANCY A. BYRD
No: 94-1856-1
My Appointment Expires June 16, 2002

[Notary]

46

CERTIFICATE OF SERVICE

The  undersigned hereby certifies that a true and correct copy of the foregoing
DEFENDANT'S VERIFIED RESPONSE TO COMPLAINT was served upon the
following by placing a copy of the same in the regular United States mails, postage pre-
paid, addressed as follows this 22nd day of May, 2002.  This is twenty days after the
receipt of complaint that was served on May 2, 2002.

Julie K. Lutz
Michael R. MacPhail
Kelli Ferrand Chan
Securities and Exchange Commission
1801 California Street, #4800
Denver, Colorado 80202

Blaine T. Welsh
United States Attorney's Office
333 Las Vegas Boulevard, Suite 5000
Las Vegas, Nevada 89101

I declare under penalty of perjury that the foregoing is true and correct.


Larry A. Stockett

## ATTACHMENTS TO DEFENDANT'S VERIFIED RESPONSE TO COMPLAINT

1. Letter from VP of Wells Fargo attesting to $500,000 of cash assets of U.S. Cement dated August 24, 2000 with reference to banking relationship since May, 1999 for U.S. Cement Company. One example of proof of absurd claim by SEC of no assets.

2. Letter from Declan O'Donnell sting he has appeared on my behalf with the SEC in Denver since December 8, 2000 for all discovery, depositions, responses to subpoenas and other legal work associated with investigation that has developed the current complaint against Defendant.

3. Best Appraisals showing independent appraisal of assets in excess of $6.4 million (40 x $160,000) and orderly liquidation value of $320,000 as is where is (40 x $8,000).

4. Press article April 29, 2002 reporting the SEC raided Stockett's house and containing false and misleading statements contained in the complaint and press release issued by the SEC.

5. Copy of Search warrant issued by FBI and attached list of computers and files seized by FBI and reviewed by Kelli Chan according to her sworn testimony, without any notice or due process to obtain these records for a civil investigation.

6. Copy of fully executed agreement dated September 6, 2001 regarding supply of cement for $27 per ton from Thailand Cement Supplier (Billion dollar company).

7. Copy of proposal submitted for discussion and negotiations with Frehner Construction, with written representations of the $5 million proposed to be invested by Gene Isaacs showing Mr. Stockett was acting with his knowledge and consent and delivered in his presence to Mr. Frehner. This document will demonstrate that the press release regarding financing for Basalt Fiber Industries was based upon promises of Mr. Isaacs that were not delivered.

8. Commercial feasibility study prepared for Hightec subsidiary, Basalt Fiber Industries financing for which was referenced in press release.

## CERTIFICATE OF SERVICE

The  undersigned hereby certifies that a true and correct copy of the foregoing
ATTACHMENTS TO DEFENDANT'S VERIFIED RESPONSE TO COMPLAINT was
served upon the following by placing a copy of the same in the regular United States
mails, postage pre-paid, addressed as follows this 22nd day of May, 2002.  This is twenty
days after the receipt of complaint that was served on May 2, 2002.

Julie K. Lutz
Michael R. MacPhail
Kelli Ferrand Chan
Securities and Exchange Commission
1801 California Street, #4800
Denver, Colorado 80202

Blaine T. Welsh
United States Attorney's Office
333 Las Vegas Boulevard, Suite 5000
Las Vegas, Nevada 89101

I declare under penalty of perjury that the foregoing is true and correct.

Larry A. Stockett

PLEASE TYPE OR PRINT

FOR SHIPMENTS WITHIN U.S. ONLY

**Sender Account Number**
187850720   Unishippers  102218609
**FROM (Company)**
Performance Marketing Assoc
Ste 104
**Street Address**
3275 S Jones BLVD
**City**              **State**
Las Vegas            NV
**ZIP CODE (Required)**
89146
**Sent by (Name/Dept)**       **Phone**
Larry Stockett   (702)284-7400

**TO (Company)**
Security & Exchange Commission
**Street Address**
1801 California St. #4800
**City**              **State**
Denver,              CO
**ZIP CODE (Required)**
80202
**Attention: (Name/Dept)**    **Phone (Important)**
Lutz, MacPhail, Chan   303-844-1010
**Description**
Attn Larry (CV-S-02-0607-PMP-LRL)
**Sender's Signature**        **Date**
                              5-22-02

**Preprint Format No.**

**Payment**
Sender will be billed unless marked otherwise
Bill to:
☐ Receiver   ☐ 3rd Party
☐ Paid in Advance   Check No.   Amount
Billing Reference (will appear on invoice)
TD1121

**Origin  Airbill Number**
LAS   1320287614
Account # (Required if 3rd Party)

**# of Pkgs**  **Weight(LBS)**  **Packaging**
1              1  lb

**Special Instructions**
☐ Saturday Delivery
  Extra charge Express only
☐ Lab Pack Service
☐ Hold at Airborne

**Declared Value**  ☐ or  **Full Insurance** ☐  **Shipment Valuation** $         .00

Airborne Signature

Date     Time     Route No.

Received At
☐ Drop Box #                 ☐ Airborne Terminal

**Service Type**
One box must be checked Assumed Express unless noted.
☒ Express (Letter - 150 lbs)
☐ Next Afternoon (Letter - 5 lbs)

ABSENT A HIGHER SHIPMENT VALUATION CARRIERS LIABILITY IS LIMITED TO $100 PER PACKAGE, OR ACTUAL VALUE, WHICHEVER IS LESS. SPECIAL OR CONSEQUENTIAL DAMAGES ARE NOT RECOVERABLE. SEE TERMS AND CONDITIONS ON REVERSE SIDE OF THIS NON-NEGOTIABLE AIRBILL. SCAC: ABF FED I.D. NO. 91-0927469

**AIRBORNE EXPRESS**
PO BOX 662, SEATTLE, WA 98111-0662
1 (800) 247-2676

SENDER'S COPY

# CALIFORNIA OVERNIGHT
## On Time Delivery For Less

**800 334-5000**
*Call For A Pickup!*

Shipper's Name and Address
PERFORMANCE MKTG ASSOCIATIONS        9295

3275 S JONES  #104

LAS VEGAS, NV 89146

Account Number
54094

Date
5-22-02

Page
1 of 1

## Recipient's Name and Address
We cannot deliver to a post office box.
A zip code is required for all shipments.

| Service Options | Billing Information | Pieces and Weight |
|---|---|---|

*If no box is checked, Sunrise Service will be applied.*
*Minimum charge weight is 300 lbs. - Delivery by 3:00 P.M.*
*Note: delivery times for all services may be later in some areas.*

☐ Late Night Express *(See Reverse Side for Details)*

---

**Piece 1**

Recipient's Name
Blaine T. Welsh (#4790)    376 143 453
702-388-6336

United States Attorney's Office
Suite #
5000
333 Las Vegas Blvd.
Las Vegas    NV 89101

Shipper's Ref #
Larry-CV-S02-0607-PMP-LRL

☒ SUNRISE - BY 10:30 AM*
☐ SUNRISE GOLD - BY 8:00 AM
☐ HEAVYWEIGHT**
☐ Declared Value $ _____ (maximum $25,000)
☐ Saturday Delivery - Extra Charge (see Service Guide for details)
☐ C.O.D. Amount $ _____ (affix C.O.D. tag to package)
☐ HOLD FOR PICKUP
☒ This shipment requires a delivery signature

☒ Bill Shipper's Account   Piece 1 of 1
☐ Bill Recipient   Acct #
☐ Bill Third Party   Acct #

Specify:
☐ 8 oz. Letter or
Weight _____ lbs. (Subject to correction)
Dim weight charge if greater than actual weight
L _____ x W _____ x H _____ ÷225 =

---

**Piece 2**

Recipient's Name            376 143 462

Company

Street Address            Suite #

City    State    Zip Code (Required)

Shipper's Ref #

☐ SUNRISE - BY 10:30 AM*
☐ SUNRISE GOLD - BY 8:00 AM
☐ HEAVYWEIGHT**
☐ Declared Value $ _____ (maximum $25,000)
☐ Saturday Delivery - Extra Charge (see Service Guide for details)
☐ C.O.D. Amount $ _____ (affix C.O.D. tag to package)
☐ HOLD FOR PICKUP
☐ This shipment requires a delivery signature

☐ Bill Shipper's Account   Piece of
☐ Bill Recipient   Acct #
☐ Bill Third Party   Acct #

Specify:
☐ 8 oz. Letter or
Weight _____ lbs. (Subject to correction)
Dim weight charge if greater than actual weight
L _____ x W _____ x H _____ ÷225 =

---

**Piece 3**

Recipient's Name            376 143 471

Company

Street Address            Suite #

City    State    Zip Code (Required)

Shipper's Ref #

☐ SUNRISE - BY 10:30 AM*
☐ SUNRISE GOLD - BY 8:00 AM
☐ HEAVYWEIGHT**
☐ Declared Value $ _____ (maximum $25,000)
☐ Saturday Delivery - Extra Charge (see Service Guide for details)
☐ C.O.D. Amount $ _____ (affix C.O.D. tag to package)
☐ HOLD FOR PICKUP
☐ This shipment requires a delivery signature

☐ Bill Shipper's Account   Piece of
☐ Bill Recipient   Acct #
☐ Bill Third Party   Acct #

Specify:
☐ 8 oz. Letter or
Weight _____ lbs. (Subject to correction)
Dim weight charge if greater than actual weight
L _____ x W _____ x H _____ ÷225 =

---

**Piece 4**

Recipient's Name            376 143 489

Company

Street Address            Suite #

City    State    Zip Code (Required)

Shipper's Ref #

☐ SUNRISE - BY 10:30 AM*
☐ SUNRISE GOLD - BY 8:00 AM
☐ HEAVYWEIGHT**
☐ Declared Value $ _____ (maximum $25,000)
☐ Saturday Delivery - Extra Charge (see Service Guide for details)
☐ C.O.D. Amount $ _____ (affix C.O.D. tag to package)
☐ HOLD FOR PICKUP
☐ This shipment requires a delivery signature

☐ Bill Shipper's Account   Piece of
☐ Bill Recipient   Acct #
☐ Bill Third Party   Acct #

Specify:
☐ 8 oz. Letter or
Weight _____ lbs. (Subject to correction)
Dim weight charge if greater than actual weight
L _____ x W _____ x H _____ ÷225 =

---

| Route # | Driver # | Pick-up Time | Total Pieces | Shipper's Signature | Total Pieces |
|---|---|---|---|---|---|
| Driver's Signature | | Date | | Print Name Erin E. Jolie | |

CALIFORNIA OVERNIGHT COPY – SEE REVERSE SIDE FOR TERMS AND CONDITIONS AND LIMITS OF LIABILITY

## ATTACHMENTS TO DEFENDANT'S VERIFIED RESPONSE TO COMPLAINT

1. Letter from VP of Wells Fargo attesting to $500,000 of cash assets of U.S. Cement dated August 24, 2000 with reference to banking relationship since May, 1999 for U.S. Cement Company. One example of proof of absurd claim by SEC of no assets.

2. Letter from Declan O'Donnell sting he has appeared on my behalf with the SEC in Denver since December 8, 2000 for all discovery, depositions, responses to subpoenas and other legal work associated with investigation that has developed the current complaint against Defendant.

3. Best Appraisals showing independent appraisal of assets in excess of $6.4 million (40 x $160,000) and orderly liquidation value of $320,000 as is where is (40 x $8,000).

4. Press article April 29, 2002 reporting the SEC raided Stockett's house and containing false and misleading statements contained in the complaint and press release issued by the SEC.

5. Copy of Search warrant issued by FBI and attached list of computers and files seized by FBI and reviewed by Kelli Chan according to her sworn testimony, without any notice or due process to obtain these records for a civil investigation.

6. Copy of fully executed agreement dated September 6, 2001 regarding supply of cement for $27 per ton from Thailand Cement Supplier (Billion dollar company).

7. Copy of proposal submitted for discussion and negotiations with Frehner Construction, with written representations of the $5 million proposed to be invested by Gene Isaacs showing Mr. Stockett was acting with his knowledge and consent and delivered in his presence to Mr. Frehner. This document will demonstrate that the press release regarding financing for Basalt Fiber Industries was based upon promises of Mr. Isaacs that were not delivered.

8. Commercial feasibility study prepared for Hightec subsidiary, Basalt Fiber Industries financing for which was referenced in press release.

**WELLS**
**FARGO**

Wells Fargo Bank Nevada NA
Business Banking Group
S4733-012 MAC
1st Floor
3800 Howard Hughes Parkway
Las Vegas, NV 89109

August 24, 2000

PriceWaterhouseCoopers LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada  89109

Re:     US Cement Company

Mr. Karo:

This letter is to serve as notification the US Cement Company has been banking with
Wells Fargo Bank, Nevada N.A. since May 1999.  The customers banking relationship at
this current time is in the excess of $500,000.00.

Sincerely,

Timothy Kinsey
Vice President
Business Banking Group

# Declan Joseph O'Donnell, P.C.

DECLAN J. O'DONNELL
E-Mail: DJOPC@uswest.net

ATTORNEYS AT LAW
499 S. Larkspur Drive
Castle Rock, CO 80104
USA

303 688-1193
800 632-2828
Fax: 303 663-8595

December 8, 2000


Mr. Michael McPhail, Esq.
Mrs. Kelli Chan, Esq.
US Securities & Exchange Commission
1801 California St., Ste. 4800
Denver, CO 80202-2648

RE:   Mr. Larry Stockett and the Premier Marketing Case

Dear Mr. McPhail and Mrs. Chan:

This will enter my appearance on behalf of Mr. Stockett in the Premier Marketing case. I expect to coordinate a deposition of Mr. Stockett in Denver, Colorado, probably in early February, 2001. I will try to complete the subpoena production process well in advance of that setting.

Enclosed is a copy of my request for documents sent today to Mr. Brent Baker in Salt Lake City. I have no background whatsoever on this matter and would appreciate any relevant additional documents from you. For example, are there any consent decrees or court cases pending with persons or companies in your Premier Marketing matter? If so, I request copies of them.

Thanks for your ongoing cooperation, as usual.

Sincerely,


Declan J. O'Donnell

DJO/rg

Enclosure

# Best Appraisals Inc
The Industrial and Commercial Specialists

September 20, 1999

Larry Stockett
4185 South Paradise Road, Suite 1115
Las Vegas, Nevada 89109

ATTN:        *Mr. Larry Stockett*

RE           MACHINERY & EQUIPMENT APPRAISAL

SUBJECT      40 – TRAIN SLEEPER CAR MOBILE HOTEL

We have completed our preliminary research and analyses of the above referenced
assets   Our opinion of value is submitted herein, specifically addressing both the
FAIR MARKET VALUE IN CONTINUED USE (upon refurbishment and transportation)
and ORDERLY LIQUIDATION VALUE REMOVED.

Upon completion, the actual narrative reports will comply with the current USPAP
regulations, pertaining to a Complete Appraisal, delivered via a Summary report.
All three approaches to value (Cost, Market and Income) have been considered

FAIR MARKET VALUE IN CONTINUED USE
* As - is, where – is in Wilkes-Barre, PA          $    14,000   x 4D
  each
* Upon refurbishment and relocation to Las Vegas, NV  $   160,000   x 40
  each

ORDERLY LIQUIDATION VALUE REMOVED
* As - is, where – is in Wilkes-Barre, PA          $     8,000   x 40
  each
* Upon refurbishment and relocation to Las Vegas, NV  $   110,000   x 40
  each

Should you have any questions, please call.

Sincerely,

Joel D  Gonia, ASA
Chief Executive Officer

JUL-19-99 05:01 PM     ST APPRAISALS          502  97 8179          P.02

## PROPOSAL

## APPRAISAL OF
## MACHINERY & EQUIPMENT

## ASSETS OF:  40-TRAIN SLEEPER CAR MOBILE HOTEL

ORDERLY LIQUIDATION VALUE
FAIR MARKET VALUE IN CONTINUED USE

Recognized for our standards-setting appraisals, Best Appraisals, Inc. was selected by the Federal Bankruptcy Court for the Western District of Kentucky in 1991 to conduct all Chapter 13 Bankruptcy appraisals in the Louisville area, which we continue to perform today.

Each of our Machinery & Equipment appraisers have direct access to auction sales results for thousands of items each year through its sister company, Best Auctions, Inc.  The largest industrial and commercial equipment auction firm based in the area, Best Auctions, Inc. is an immediate source of current information and documented sales data related to Machinery & Equipment.

Whether your project is small or large, one location or numerous facilities around the country,. Best Appraisals, Inc. possesses the experience and resources to complete the project on time, in a professional manner that is fully documented for your security. **Truly, Best Appraisals, Inc. is "*The Industrial and Commercial Specialist.*"**

Best Appraisals, Inc. has been <u>approved</u> by the following organizations -- Please contact them at your convenience.

- Bank of America, Joe Virzi — ( 216 ) 344-2304
- Bank of Louisville, Chuck Peak — ( 502 ) 562-5853
- Bank One - Akron, David Frances — ( 330 ) 972-0330
- Bank One - Cincinnati, Steve Kuhn — ( 513 ) 985-5057
- Bank One - Louisville, Steve Cooper — ( 502 ) 566-2793
- Central Bank, Jim Ensminger — ( 606 ) 253-6235
- Civitas Bank, Chris Bottorff — ( 502 ) 899-2168
- Fifth Third Bank - Cinn., Keith Goodpaster — ( 513 ) 579-5103
- Fifth Third Bank - Louisville, Bill Otten — ( 502 ) 562-5535
- Huntington Bank, Jerry Kelsheimer — ( 513 ) 762-1842
- Heller Financial, Craig Middendorf — ( 513 ) 762-7802
- KeyBank, Steve Bloemer — ( 513 ) 762-8207
- National Bank of Canada, Tom Roberts — ( 513 ) 621-1942
- National City Bank, Randy Rawe — ( 502 ) 581-7688
- NBD Bank, N. A., Richard Hennessy — ( 812 ) 284-7398
- Norwest Business Credit, Paul Count — ( 317 ) 581-6195
- Pine South Capital, Nelson Clemmens — ( 502 ) 587-6800
- PNC Bank, Larry Reynolds — ( 502 ) 582-2171
- Provident Bank, Sam Harris — ( 513 ) 579-2618
- Regional Bank, Larry Brumley — ( 812 ) 948-5514
- Star Bank, Mark Wheeler — ( 502 ) 562-6336
- Stock Yards Bank, Jack Jenkins — ( 502 ) 582-2571

Please contact **Mr. Joel D. Gonia**, Chief Executive Officer of Best Appraisals, Inc. to request specific information or to answer any questions pertaining to Machinery & Equipment appraisals.

Return to the referring page.

4 5 5   6 4 1 0

Las Vegas SUN

April 29, 2002

# Binion trial witness accused of securities fraud

**By Grace Leong**

<grace@lasvegassun.com>
LAS VEGAS SUN

The Securities and Exchange Commission sued Las Vegas businessman Larry Stockett, whom it accused of being a "recidivist securities violator ...with a lengthy disciplinary record" with both state and federal regulators since 1989, alleging he defrauded penny stock investors out of $1.37 million.

Stockett, the owner of defunct cement plant operators, The S.I.N.C.L.A.R.E. Group Inc., its affiliate Hightec Inc. and its subsidiaries U.S. Cement Inc. and Basalt Fiber Industries Inc., was accused in Friday's U.S. District Court suit of disseminating "flagrantly false and misleading" financial statements about the companies through press releases, spam e-mails, infomercials and the Internet to induce investors to buy Hightec stock.

Stockett, who was accused of selling at least 8 million shares of unregistered Hightec stock from Jan. 12, 2000, through March 21, 2001, and generating "illicit" profits of about $804,687, also allegedly misappropriated $569,505 in investors' funds to pay for a luxury home, a Jaguar, a boat and other personal expenses.

The SEC said Stockett was previously sanctioned in California in 1989 and in Oregon in 1999 for violations of federal securities laws and ordered to pay a $50,000 civil penalty.

Stockett earlier gained attention in Las Vegas during the Ted Binion murder trial.

Stockett testified that he tried to buy MRT Transport, a trucking company owned by Binion's convicted killer Rick Tabish, days before Binion's death.

Stockett was arrested in April 2000 in Las Vegas, following his testimony, on charges of passing three bad checks.

Dan Ahlstrom, deputy district attorney with the Clark County District Attorney Office's Bad Check Diversion Unit, said the agency dismissed the bad check charges against Stockett after he paid about $8,800 in restitution and penalties in August 2001.

The SEC, which raided Stockett's home in Las Vegas in March 2001 and collected a number of documents, said it found Stockett had disseminated false statements about the legal status, business operations and financial projections of Hightec and S.I.N.C.L.A.R.E. -- both former Delaware corporations with offices located at Stockett's home.

Stockett, who allegedly failed to disclose to investors his "track record" of securities law violations as well as a 1991 personal bankruptcy filing in Oregon, also allegedly failed to disclose that Hightec and S.I.N.C.L.A.R.E. had their corporate charters revoked in 1999 by the state of Delaware because he failed to file mandatory reports and pay taxes owed by the two companies.

1

2

3       **UNITED STATES DISTRICT COURT**

4                    **DISTRICT OF NEVADA**

5                         -oOo-

6   UNITED STATES OF AMERICA,        )          MAG. 01-2083-M-PAL

                                     )
7               vs.                  )      Case No. _____

                                     )
8   PREMISES KNOWN AS                )          **SEARCH WARRANT**
    3769 MESA LINDA DRIVE            )
9   CITY OF HENDERSON,               )
    COUNTY OF CLARK,                 )
10  STATE OF NEVADA                  )
    ─────────────────────────────   )

11

12  TO:        ANY SPECIAL AGENT OF THE FEDERAL BUREAU OF
               INVESTIGATION OR OTHER AUTHORIZED OFFICER:

13

14          Affidavit having been made before me by Dean R. Morse, Special Agent, Federal

15  Bureau of Investigation, Las Vegas, Nevada, which affidavit is attached hereto and incorporated

16  herein, that he has reason to believe that located within **3769 MESA LINDA DRIVE, CITY OF**

17  **HENDERSON, COUNTY OF CLARK, STATE OF NEVADA**, will be found the following

18  items:

19          (a)    Any and all instrumentalities relating to stock portfolios, shareholder

20  information, business records, as well as various correspondences relating to the manipulation of the

21  shares of stock pertaining to names and entities referenced in the Affidavit and Application, from

22  the time frame of July 1999 to present

23          (b)    Any and all documents and records that tend to indicate the identity of the

24  principals, representatives, or accomplices of the persons involved in the illegal activities described

25  in this Application and Affidavit, from the time frame of July 1999 to present, including the

26  following:

1         1 .     Identification cards, social security cards, drivers' licenses and business

2                 cards;

3         2.      Rental agreements between the owner of the premises to be searched

4                 and the occupants of the premises; and

5         3.      Limited items of personal property showing the identity of the persons

6                 having a possessory interest, dominion and control, or some other

7                 connection with the premises to be searched, including rent and utility

8                 receipts, addressed envelopes, photographs, bank records and

9                 telephone bills.

10       (c)     Any and all documents and records which may contain or reveal the identity of

11 victims or persons who were contacted by the persons attempting to commit, or committing, the illegal

12 activities described in this Application and Affidavit including all hard copies of such documents or

13 records, and any and all such documents and records contained in computers or computer processing

14 units or computer hardware, and any and all software, manuals and peripherals which may facilitate the

15 ability to retrieve those documents and records, from the time frame of July 1999 to present.  The term

16 computer hardware shall include the computer or computer processing unit, hard drive, monitor, printer,

17 power supply and external devices such as modems, facsimile modems, external disks, external storage

18 devices (e.g., tape backups), labeling devices, document scanners and mouse.  The term software shall

19 include all floppy disks, diskettes, software manuals, backup software or any other kinds of computer

20 data storage mechanisms.

21       (d)     Any and all documents and records which may contain or reveal the existence

22 and/or location of bank accounts or any other assets of the persons responsible for, or profiting from,

23 the illegal activities described in this Application and Affidavit including all hard copies of such

24 documents or records, any and all such documents and records contained in computers or computer

25 processing units or computer hardware, and any and all software, manuals and peripherals which may

26 facilitate the ability to retrieve those documents and records, from the time frame of July 1999 to

1 | present.  The term computer hardware shall include the computer or computer processing unit, hard

2 | drive, monitor, printer, power supply and external devices such as modems, facsimile modems, external

3 | disks, external storage devices (e.g., tape backups), labeling devices, document scanners and mouse.

4 | The term software shall include all floppy disks, diskettes, software manuals, backup software or any

5 | other kinds of computer data storage mechanisms.

6 |         (e)     The documents or records to be seized shall include the following, from the time

7 | frame of July 1999 to present:

8 |         1.     Bank records, statements, deposit slips, checks, and checking account

9 |               numbers; And

10 |         2.     Tape recordings, notes, correspondence, facsimile messages, or any

11 |               similar data compilation, and any other similar financial or asset

12 |               information.

13 |         3.     Any and all documentation of telephone numbers or access codes for

14 |               telephone service including hand written notes; address books;

15 |               telephone records; photographs; any documentation reflecting

16 |               additional names, addresses, telephone numbers, and other information

17 |               identifying co-conspirators, witnesses, customers and victims; and

18 |               printed instruction.

19 |         4.     All billing or invoice notation or indication of accounting for amount

20 |               of usage, including notations of individual call length and location of

21 |               call or identity of originator.

22 |         5.     Documents evidencing the obtaining, secreting, transfer, concealment,

23 |               and/or expenditure of proceeds of the crime including:

24 |         6.     Books, records, receipts, bank statements and records, account and

25 |               transaction records from companies offering fund transfer service

26 |               (such as Western Union), money drafts, letters of credit, money order

1           and cashier's check receipts, passbooks, bank checks, credit card

2           receipts and statements.

3      7.    Books, records, receipts, notes, ledgers and other papers relating to the

4           transportation, ordering, purchase or acquisition of personal assets.

5      8.    Telephone records.

6      9.    Toll slips, notes, scratch papers with telephone numbers or addresses

7           on them;

8     10.    Sales records, customer lists;

9     11.    "Pitch" sheets, sales scripts and notes relating to sales presentation;

10    12.    United Parcel Service, Federal Express, DHL World Wide Express or

11          any other carrier envelopes and packaging material, and any other

12          documentation associated with the use of common carriers for the

13          mailing or receipt of funds or other documentation;

14    13.    Any and all credit card sales receipts that may apply to sales records;

15              and

16    14.    Any communications with consumers contacted by the persons who

17          have committed, are committing, or have attempted to commit the

18          illegal activities described in this Application and Affidavit.

19    (f)    Containers of documents and their contents, including brief cases, file folders

20 and file cabinets, from the time frame of July 1999 to present.

21        **YOU ARE HEREBY COMMANDED** to search forthwith the place named for the

22 property specified, serving this warrant and making the search in the daytime, and if the property

23 described be found on the premises, to seize it, leaving a copy of this warrant and a receipt for the

24

25

26

4

1   property taken, and to prepare a written inventory of the items seized and return this warrant to the

2   undersigned United States Magistrate Judge and Court, accompanied by a written inventory of any

3   items taken, within ten (10) days of this date, as required by law.

4

5          DATE:        _3 - 29 - 01_

6          TIME:        _11.25 a m_

7                                      PEGGY A. LEEN

8
                                       _____
9                                      UNITED STATES MAGISTRATE JUDGE

10
                                       I attest and certify on __3-29-01__ that
11                                     this is a full true and correct copy of the
                                       original document.
12                                          PEGGY A. LEEN
                                          U.S. MAGISTRATE JUDGE
13                                        DISTRICT OF NEVADA

14
                                       By _____H. Dane_____  ___Deputy
15                                                              ___Secretary

16

17

18

19

20

21

22

23

24

25

26

                                       5

# ATTACHMENT A

Computer Evidence

A. Based upon your Affiant's experience and training your affiant knows that individuals involved in securities fraud utilize their computers as instrumentalities of criminal offenses. This data may be more fully described as any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment. This media includes but is not limited to any fixed disks, external hard disks, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, laser disks, or other memory storage devices.

B. The terms "records, documents, and materials, including those used to facilitate communications" as used above includes but is not limited to records relating to business activities (such as invoices, receipts, customer lists, lead lists, telephone records, and correspondence); associate names and addresses (as contained in, among other things, telephone and address records of associates, premium suppliers, and customers); and the identity and location of assets illegally gained through criminal activity (including but not limited to any invoices, receipts, bank account records, income tax returns, telephone records and correspondence)].

C. The terms "records, documents, and materials, including those used to facilitate communications" as used above includes all of the foregoing items of evidence in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs), or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks), as well as printouts or readouts from any magnetic storage device].

D. The terms "records, documents, and materials, including those used to facilitate communications" as used above shall include any and all communications previously received or transmitted, or prepared in contemplation of transmission, including electronic mail or data associated with electronic bulletin board systems, stored on any of the electronic media named above. All electronic communications, including those previously received or transmitted, and those in transmission, or held in temporary, intermediate storage incident to transmission. The terms "records, documents, and materials, including those used to facilitate communications" as used above shall include any and all communications, previously received, transmitted, or stored, or prepared in contemplation of transmission, or any communications in the process of being received or transmitted, including electronic mail or data associated with electronic bulletin

board systems, whether stored on any of the electronic media named above or held in temporary, intermediate storage incident to transmission to the individuals or premises within the scope of this application.

E. The terms "records, documents, and materials, including those used to facilitate communications" as used above shall also be read to include any and all electronic information or electronic data, stored in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and other media capable of storing magnetic or optical coding.

F. Such electronic data in the form of electronic records, documents, and materials, including those used to facilitate communications constitutes evidence of the commission of a criminal offense. These materials are therefore subject to seizure pursuant to Rule 41 of the Federal Rules of Criminal Procedure, and the devices used to store or facilitate storage of such materials may be retained as evidence in the commission of a crime for a reasonable period of time and may be examined, analyzed, and tested for a reasonable period of time as evidence in the commission of a crime.

G. Based upon your affiant's knowledge, training and experience, and consultations with Special Agent Chris McConney who has received degrees in Computer Information Systems and has been specially trained in the seizure of computers and how computer operating systems function and store data, your Affiant knows that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to insure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

      1.    The volume of evidence. Computer storage devices (such as hard disks, diskettes, tapes, laser disks, Bernoulli drives, etc.) can store the equivalent of thousands of pages of information. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data analysis "on-site."

      2.    Technical requirements. Analyzing computer systems for criminal evidence is a highly technical process requiring expert skill and a properly

controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus it is difficult to know prior to the search which expert possesses sufficient specialized skills to best analyze the system and its data. No matter which system is used, however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

H. Due to the volume of the data at issue and the technical requirements set forth above, it is usually necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting. It may be the case, however, under appropriate circumstances, that some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises. One factor used in determining whether to analyze a computer on-site or to remove it from the premises is whether the computer constitutes an instrumentality of an offense and is thus subject to immediate seizure as such--or whether it serves as a mere repository for evidence of a criminal offense. Another determining factor is whether, as a repository for evidence, a particular device can be more readily, quickly, and thus less intrusively analyzed off site, with due consideration given to preserving the integrity of the evidence. This, in turn, is often dependent upon of criminal offenses. These computers are likely to take the form either of "mainframe" computers, or of "micro" or "personal" computers, either standing alone or joined through a series of connected computers called a "network."

I. Computers recognized in the computer trade as "mainframe" computers share the characteristic that they are physically large pieces of equipment designed to process and store large amounts of data. Such computers often are designed to facilitate usage by more than one individual at a time, often servicing a number of users at any of several remote locations. Because of these characteristics, physical removal of mainframe-types of computers is often impractical, thus necessitating that investigators analyze these computers on-site to seize pertinent data. Thus a presumption exists that such computers will be analyzed, and pertinent data seized from them, by investigators working on the subject premises.

J. Computers recognized in the computer trade as "micro" or "personal" computers share the characteristic that they are often substantially smaller devices, often capable of being stored on or in a single desk or station. While the storage capabilities of such devices vary, micro or personal computers are more often designed to facilitate usage by a single individual. Because of these characteristics, physical removal of micro or personal computers is often the more practical

3

alternative, and is often less intrusive than requiring federal agents to remain at the premises for the amount of time reasonably required to review, analyze, and copy pertinent data. Thus a presumption exists that such computers will be seized and subsequently processed by a qualified computer specialist in a laboratory setting for reasons set forth above.

K.  Based upon your affiant's knowledge, training, and experience, and the experience of other law enforcement personnel, your affiant knows that searches and seizures of evidence from computers taken from the subject premises commonly require agents to seize most or all of a computer system's input/output peripheral devices for a qualified computer expert to accurately retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the subject premises, and in order to fully retrieve data from a computer system, investigators must seize all magnetic storage devices as well as the central processing units (CPUs) and applicable keyboards and monitors which are an integral part of the processing unit. If, after inspecting the input/output devices, system software, and pertinent computer-related documentation it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, such materials and/or equipment will be returned within a reasonable time.

Analysis of electronic data

L.  The analysis of electronically stored data, whether performed on site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

4

FD-597 (Rev. 3-29-93)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

Page _1_ of _3_

On (date) _4/2/2001_

Time: _10:30 AM_

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) _Larry Stockett_
(Street Address) _3769 Mesa Linda Drive_
(City) _Henderson NV 89112_

Description of Item(s):

1 (1) Compaq Presario Midtower s/n 1X07DTYBJ4CL (Room D) MAT
2 (1) Dell Dimension XPS B1000 s/n 45ZR201 (Room O) MAT
3 (1) Compaq Presario laptop s/n 1V8CCFK6G1274 (Room D) MAT
   w/ power supply    Nothing follows this page

Received by: SA _____ (Signature)

Received from _Larry Stockett_ (Signature)

FD-597 (Rev. 3-29-93)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
**Receipt for Property Received/Returned/Released/Seized**

Page __2__ of __3__

On (date) ____04/02/01____

Time: ____12:45p____

Item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) __Larry Stockett__

(Street Address) __3769 Mesa Linda Drive__

(City) __Henderson, NV  89120__

Description of Item(s):

#4 - Two lined notebooks with handwriting
5 - Photos & press clippings from briefcase
6 - Financial & business notes
7 - Handbook and Mailing Materials
8 - 3 floppy disks, 4 zipdisks, 8 TDK CDs
9 - Bank Records, Stock Transfers, Business Cards
10 - Misc documents from desktop in Study (upstairs)
11 - 6 Computer disks/upstairs desk
12 - Misc documents from dresser drawer
13 - Wells Fargo wire receipt
14 - Misc documents in rear walkin closet
15 - Bank records
16 - Mortgage documents
17 - Misc Documents from upstairs desktop
18 - 2 Bank checks (Merrill Lynch)
19 - Tut & Papers from upstairs desk
20 - Address Books, Portfolio, Investment Brochures,
     Bank account documents & Letters from Brookshelf upstairs
21 - (inside purse) and handwritten letter
22 - Bank records
23 - Telephone records, Bank records, 2 compact disks
24 - US Cement and Hightel Correspondence
25 - Bank books, Financial Info, Stock Certificates

Received by: SA _[signature]_
(Signature)

Received from _[signature] Larry Stockett_
(Signature)

FD-597 (Rev. 3-29-93)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
**Receipt for Property Received/Returned/Released/Seized**

Page 3 of 3

On (date) 04|02|01

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

Time: 12:45 PM

(Name) Larry Stockett
(Street Address) 3769 Mesa Linda Drive
(City) Henderson, Nv 89120

**Description of Item(s):**

26 - Black Organizer containing documents (wh: Mustang)
Nothing Follows

Received by: SA [signature]
(Signature)

Received from [signature]
(Signature)

FD-597 (Rev. 3-29-93)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

Page ___1___ of ___1___

On (date) ___23 MARCH 2001___

item(s) listed below were:
☒ Received From
☐ Returned To
☐ Released To
☐ Seized

Time: ___0930 (AM)___

(Name) ___LARRY STOCKETT___
(Street Address) ___3769 MESA LINDA DRIVE___
(City) ___LAS VEGAS, NEVADA___

Description of Item(s):

(1) Documents relating to Ackerpost Western, dated 2000 and 2001, U.S. Comext 2000 and 2001 ...

(2) Envelope addressed to ...

(3) Ackerpost ...

(4) Native American ...

NO USE

Received by: _[signature]_ (Signature)      Received from _Larry Stockett_ (Signature)

CONTRACT NO : PL-SC01-041

DATE         : SEPTEMBER 6, 2001

1

# SALES & PURCHASE CONTRACT

This Contract is made between **U.S. Cement Company 3769 Mesa Linda Drive, Las Vegas, Nevada, USA 89120**, (hereinafter referred to as "BUYER") and **TPI Polene Public Company Limited, 26/56 Chan Tat Mai Rd, Thungmahamek, Sathorn, Bangkok 10120, Thailand**, (hereinafter referred to as "SELLER"), at Seller's office on **September 6, 2001** as follow -

## 1. SELLER

TPI Polene Public Co., Ltd
26/56 Chan Tat Mai Rd., Thungmahamek, Sathorn, Bangkok 10120 Thailand
Tel No. (662) 213-1039
Fax No. (662) 285-5090 Ext. 12771

## 2. BUYER

U.S. Cement Company
3769 Mesa Linda Drive, Las Vegas, Nevada, USA   89120
Tel No. (702) 3692126
Fax No. (702)3692136
Attn. Mr. Larry Stockette / President

## 3. SELLING AGENT

Namthai Intertrade Co., Ltd
30/128  Soi Chinakhet 2/11, Ngamwongwan Road,
Laksi, Bangkok  10210 Thailand
Tel No. (662) 591-2648
Fax No. (662) 954-5139
Attn. Mr. Suradej K. Chaikul / Managing Director

## 4   QUALITY

* Ordinary Portland Cement Type V conforming to ASTM C-150 packing in 2 MT Jumbo Bag
* Quality final at loading port per **SGS Certificate** at Seller's expenses

> 4.1.1   The Seller shall supply the Buyer with monthly routine test certificates from the manufacturing plant, showing the average results from sample tests made on batches of CEMENT JUMBO BAG Produced.
>
> 4.1.2   Prior to the loading of each shipment of CEMENT JUMBO BAG, the **Seller shall furnish to the Buyer by telefax or e-mail certified quality test results**, which reflect the quality of CEMENT JUMBO BAG to be loaded on board the transporting vessel
>
> 4.1.3   No CEMENT JUMBO BAG failing to satisfy the specifications shall be loaded on board the transporting vessel

### 4.2   Sampling

> 4.2.1   SELLER'S independent surveyor at the CEMENT JUMBO BAG loading point shall distribute the sub-samples as follows
>
>> a   One (1) sub-sample 5 kgs shall be delivered by air courier to the Buyer
>>
>> b   One (1) sub-sample 5 kgs shall be delivered to the master of the carrying vessel at the loading port for delivery to the Buyer upon arrival
>>
>> c   One (1) sub-sample 5 kgs the referee sample, shall be retained for at least 120 days by the mutually agreeable independent surveyor, for referee testing, if required

## 5   QUANTITY

* 192,000 MT 10 % more or less at buyer's option
* Buyer has option to be declared 3 months before contract expires on October 31, 2002 to buy additional 192,000 MT (+/-10%) Ordinary Portland Type V in 2 MT Jumbo Bag subject to the seller's available cargo
* "Ton" or "Tons" or "MT" means a metric system unit of 1,000 kilograms (**or 2,204.64 pounds**)
* Weight by draft survey final at loading port per SGS **Certificate** at Seller's expense

6   **PRICE**

US$27.00 (Twenty-Seven US Dollar) per MT FOB ST Koh Sichang, Thailand.

7   **PAYMENT**

By an irrevocable L/C at sight from first class bank in full value to seller's bank against presentation of the following documents:

        a.    Signed commercial invoice, 2 originals plus 2 copies.
        b.    Bill of Lading 3/3 originals plus 2 non negotiable copies
        c.    Certificate of origin  One original plus one copy.
        d.    Draft Survey Report issued by SGS Thailand.
        e.    The Certificate of quality issued by SGS Thailand.
        f.    Cargo Manifest

One copy of the above documents shall be sent by air courier service to the Buyer within 7 working days after completed loading.

8   **SHIPMENT**

* November 1, 2001 - October 31, 2002
* Each shipment 32,000 MT /month 10 % more/less and buyer's Option.
* Load notice **minimum 35 days** before the beginning of the laycan of each shipment
* In case shipment problem seller and buyer will settle friendly

9   **PACKING**

In 2 MT  Jumbo Bag

10  **LOADING RATE**

In CQD  Term

11  **MARINE INSURANCE**

To be covered by the Buyer.

## 12   NOTICE AND NOMINATION

The Buyer shall propose their preferable laycan to the Seller at **least 15 days** in advance of the first layday at the loading port, with 5 days spread between first layday and canceling date. The Seller shall clarify their position on proposed laycan and confirm it or counter with another 5 days spread reasonably within one working day after the Buyer's proposals. Any difference in both parties' option on laycan shall be settled through mutual discussion. Latest 10 days prior to the first layday of the vessel's agreed laycan at loading port, the Buyer shall nominate vessel with full particulars including nationality/flag/class, DWT, built year, ETA loading port and cargo intake 10 % more or less in Buyer's option but it should satisfy the shipment Clause 8. The Buyer shall fix the performing vessel subject to the Seller's approval within 1 working day after the receipt of the Buyer's vessel nomination. Such approval shall only apply to the SELLER's ability to load the vessel in accordance with the terms of this contract and shall not be unreasonably withheld.

The vessel will give 7,5,3,2,1 arrival notice to the SELLER or ship agent which will be nominated by Buyer or recommended by SELLER.

## 13   SHIPPING TERMS AND SHIPPING RELATED ISSUES

13.1 Buyer is to nominate a single-deck bulk carrier with minimum 4 Holes / 4 Hatches with minimum 20 tons geared capacity, in good working order of minimum safe single pull load of 20 Mt each otherwise pro-rata. Any time lost due to breakdown of derricks/winches not to be counted as lay-time. Time to count on pro-rata on number of cranes working at time of breakdown occurrence.

13.2 In event of vessel's gears breakdown by reason of disablement or insufficient power, the period of such inefficiency shall count as laytime pro-rata to the number of gears. Seller also to provide crane operators/stevedores and utility workers to facilitate the entire loading operations at Buyer's time and expense.

13.3 Lay-time to commence counting at 1300 hrs the same day if NOR tendered before noon and lay-time to commence counting the following morning at 0800 hrs if NOR tendered after noon, unless sooner commenced in which case actual time used to count. Lay-time stop counting on completion of loading.

13.4 NOR to be tendered SHINC from Monday to Sunday, upon vessel's arrival at sea pilot station at the loading port between 0800 hrs and 1700 hrs.

13.5 Buyer shall provide L/C to Seller at least 20 days prior to the vessels arrival to move cargo ready in the commencement of loading into vessel.   In the event that any discrepancy or delay that hinder(s) the movement of cargo of less than 10 days and such discrepancy or delay occurred for any reason over which Seller has no fault.

13.6 Any time used to conduct vessel's hold survey and time lost due to vessel's failure to pass hold survey are not to count as lay time.

## 14.  FORCE MAJEURE

In the event of Acts of God, war, warlike condition, blockade, embargoes, insurrection, mobilization, governmental direction or intervention, rules and people or intervention of civil, naval or military authorities or any other agencies of government, riots, civil commotion strikes, lock outs, slowdowns, sabotage, plague, or other epidemics, quarantine, fire, flood, typhoon, hurricanes, tidal waves, landslides, lightening explosion, or any other causes beyond control of the Buyer and Seller, Buyer and Seller shall not be liable for any delay in shipment of delivery, non-delivery of destruction or discharge or any other fault in performance of this Contract arising therefrom and each party may terminate all or any part of this Contract if the cause or consequence of such Force Majeure prevails for more than 30 days.  A certificate by the Trade Department of the Chamber of Commerce of each country shall be sufficient proof of the existence and duration of such circumstances.

## 15.  GOVERNING LAW

The parties hereby agree that Swiss internal law shall be applicable to this Contract.  In case of any dispute, difference or question shall at any time here after arise between the parties in respect of or in connection with this Contract, the parties shall use their best efforts to settle such disputes amicably, but in the event that such resolution is not possible, or disputes arising in connection with present contract shall be finally settled under the rules of Conciliation and Arbitration of the International Chamber of Commerce.  Place of Arbitration shall be in Singapore and the language shall be in English.

In so far as applicable and to the extent, in which they do not contravene with the terms hereof Incoterms 2000 shall apply.

6

## 16. OTHERS

This contract cannot be transferred to any third party without the written consent of both parties

Two original contracts will be issued, exchanged, signed and kept each by the BUYER and the SELLER

All correspondence related to this contract shall be if rough

Confirmed by Buyer:
**U.S. CEMENT COMPANY**

Confirmed by Seller:
**TPI POLENE PUBLIC CO., LTD.**

_____
Mr. Larry Stockett / President

_____
Authorized Signature.

Confirmed by Selling Agent as Witness:
Namthai Intertrade Co., Ltd.

_____
Mr. Surapol S., Chaikol / Managing Director

Dear Mr. Larry Stockette.

Tomorrow LT before noon, TPIPL will fax Performa Invoice included Remarks for your opening DRAFT irrevocable L/C at sight.

_____
Mr. Thougchai N.

OCT-04-2000 06:26 FROM:                                           TO:4162318603              P.001/003
    OCT-03-00 03:59 PM          SHIRLEY JENNINGS              972 412 7447

   DCT-04-2000 05:25 FROM:                               TO:972 412 7444           P.001/003

## AGREEMENT

This Agreement is entered into this 3rd day of October 2000, by and between Larry A. Stockett, 4185 S. Paradise Rd., Las Vegas, NV 89109, ("Stockett"), George and Kate Wiens (Weins), Toronto, Canada, and Thorsten H Koster and Iliana Rincon Koster (Kosters);

Whereas, Kosters desire to obtain a loan from Stockett; and

Whereas, Thorsten Koster has personally guaranteed a loan for $500,000 from George and Kate Wiens, the proceeds of which were used to purchase stock of Hightec, Inc.

Whereas, Stockett and Wiens desire to secure their loans under the terms, conditions, and security agreements specified herein;

Now, therefore, for valuable consideration already provided, and acknowledged herein, the parties agree as follows:

1. **Loan Amount.** Stockett agrees to loan $350,000 to Koster through Chicago Title Insurance Company. The loan will be recorded as a first mortgage against the residence of Thorsten H. Koster and Iliana Rincon Koster, located at 9017 Royal Burgess Drive, Rowlett, Texas, 75089. The loan shall be repaid in full plus 10% loan fee prior to March 15, 2001.

2. **Hightec Stock collateral.** Koster has agreed to provide all stock personally owned by Koster as collateral for the $500,000 loan provided by George and Kate Wiens. This includes 3,676,000 shares of Hightec stock at Thomson Kernighan and 1,991,000 shares of Hightec stock at Canaccord Capital as of September 15, 2000. It also includes eight million (8) million shares to be received from the company and transferred into the accounts for Koster's share of the $500,000 investment, less the 500,000 shares to be transferred to the Wiens from these accounts, and 100,000 shares to be transferred to Larry Koller. In order to secure this loan, Wiens desire that their names be added to the Koster accounts so that they become joint stock brokerage accounts with Thorsten Koster and the Weins at Thomson Kernighan Securities and Canaccord Capital. Written instructions shall be provided to each stock brokerage firm that two signatures or two verbal approvals shall be required, one from Thorsten Koster and one from either of the Wiens, in order for any stock to be sold or transferred from the joint account. Monthly statements on the joint account shall be sent to Koster and Wiens. Historical statements documenting the entire trading history of the 6.3 million shares of Hightec originally in these accounts shall be provided to the Wiens and Stockett either in writing or by telephone call to the brokers. 500,000 shares of stock from these accounts that was promised to be transferred to the Wiens shall be transferred to the Wiens prior to the closing of the Stockett loan. Any stock sold or transferred from the accounts shall be used first to repay the $500,000 loan

plus $500,000 return on investment promised to the Wiens under the terms of the $500,000 loan agreement. The instructions to the brokerage firms shall state that the first $1 million from stock sales shall be paid to the Wiens. Thereafter, all proceeds from stock sales shall be paid $.028 per share to Stockett and the remaining 50% to Koster and 50% to Stockett for the first 5.3 million shares sold. None of the 8 million shares will be sold until after the 5.3 million shares have been sold. Once the $1 million has been paid to the Wiens, and the 5.3 million shares have been sold under the terms of this agreement, the proceeds from the sale of the remaining 8 million shares shall be entirely paid to Koster. These shares shall still be subject to the maximum sale of one million shares per 90 days and no more than 10% of the trading volume on any given day, and monthly statements to the Wiens..

3. Trading balance to be retained in account. The joint account may buy and sell up to 100,000 shares of Hightec stock daily based upon verbal instructions from Koster if Wiens are not available by phone, however, all cash from sale of stock must be used to repurchase stock of Hightec prior to any additional selling, and not to be distributed to Koster and Wiens.

4. Shareholder's Agreement between Koster and Wiens. Koster and Wiens agree not to sell any stock of Hightec in the joint accounts below the price of $1.00 per share. Koster and Weins may sell up to one (1) million shares between $1 and $2 so long as the shares sold do not exceed 10% of the daily trading volume on any day shares are sold. Koster and Wiens may sell up to one (1) million additional shares at prices between $2 and $3 so long as the shares sold no not exceed 10% of the daily trading volume on any day any shares are sold. Koster and Wiens may not sell any additional shares below a price of $3 per share and may not sell any more than one million shares in any 90 day period and not more than 10% of the trading volume of any day stock is sold. This agreement does not prohibit Koster or Wiens from selling additional shares of Hightec stock that they own outside of the joint Koster and Weins account.

5. Default. Any breach of this agreement which is not cured within ten days notice of breach shall be considered default of the loans from Stockett and Wiens. Upon default, Stockett and Wiens shall have the right to seize all shares of stock owned by Koster and to instruct the stock brokers and the transfer agent to stop transfer on any shares other than the transfer of any and all shares to Stockett and Wiens. Upon default of the house loan, if is not cured by Koster within ten days after receipt of written notice, Stockett shall also have the right to take immediate possession of the residence and to sell the house immediately, Koster's agree to provide possession if they fail to cure the default. This agreement and the proof of default, and failure to prove that the default has been cured, shall be satisfactory evidence to obtain a stipulation of judgement and consent decree from any court of appropriate authority for the possession of the house, sale of the house, and seizure of the stock collateral.



OCT-04-2000 06:26 FROM:                                      TO:4162318603            P.003/003

6.  **Term.** The term of this agreement shall be ten years. If all shares have not been sold within ten years, the term shall automatically be extended another ten years.

7.  **Additional Agreements.** This agreement is in addition to and supplements the loan agreement between Koster, Stockett and the Weins. Nothing in this agreement, other than the minimum price per shares to be sold, is intended to reduce the rights or remedies of the Wiens to obtain the loan repayment under the terms of their original loan agreement with Stockett and Koster.

8.  **Acknowledgment.** The undersigned hereby acknowledge that they have entered into this agreement as of the above date and understand and agree to the terms and conditions.

Agreed by:

_____
Thorsten H. Koster

_____
Iliana Rincon Koster

_____
George Wiens

_____
Kate Wiens

_____
Larry Stockett

### Hightec, Inc.
**3769 Mesa Linda Drive, Las Vegas, Nevada 89120**
**Phone: (702) 369-2126  Fax: (702) 369-2136**
http://www.uscement.com

January 27, 2002

Frehner Construction
4040 Frehner Road
Las Vegas, Nevada

Dear Mr. Frehner,

Please accept this letter as our binding offer to acquire Frehner Construction.  The terms and conditions of our proposal are as follows:

1.  Purchase price:

2.  Earnest Money Deposit:

3.  Additional portion of Purchase Price to be provided by Buyer's equity:

4.  Additional portion of Purchase Price to be provided by financing:

5.  Additional portion of Purchase Price to be subordinated by seller:

6.  Closing Date:

7.  Review and inspection of books and records:

    A:  Commence date:

    B:  Acceptance and removal of contingencies date:

8.  Representations and warranties of Seller:

    a.  Total Assets:

    b.  Total Liabilities:

    c.  Net Worth:

    d.  Total Revenues:   1999          2000          2001

    e.  Total Expenses:   1999          2000          2001

f. EBITDA:        :   1999 _____   _____ 2000 _____   _____ 2001 _____   _____

g. After Tax Profits: 1999 _____   _____ 2000 _____   _____ 2001 _____   _____

9. If any of the above financial conditions are determined to be plus or minus 10%
different upon inspection of the books and records, the purchase price will be
adjusted accordingly or the purchase agreement can be rescinded and the earnest
money deposit returned. If upon inspection of the and acceptance of the financial
condition, the representations and warranties are within plus or minus 10% of
each of the above financial representations, the closing shall proceed as agreed
upon.

10. Special Conditions:

_____

_____

_____

_____

_____

_____

11. Representations and Warranties of Buyers:

   a.  Principal Shareholders have net worth in excess of

   b.  Principal Shareholders are selling current mining assets for $50,000,000.

   c.  Cash to be received from sale of current business:

       Within ten days:   $15,000,000
       Within ninety days: $35,000,000

   d.  Additional financing to be arranged on Wall Street within          days.

   e.  Seller agrees to carry back                  of total purchase price in
       exchange for a royalty of                    per ton royalty of all basalt
       mined by company for                         years, capped and a total royalty of

12. Due Diligence:  Both parties shall have the right to do normal due diligence
associated with a transaction of this nature including inspection of books and
records, financial statements, discussions of any outstanding litigation, inspection
of sites and facilities and equipment lists, etc.

13. Financing Documentation:  Both parties agree to cooperate and provide all
necessary information and inspections for Wall Street underwriters, surety

bonding agents, insurance companies and accountants to prepare documentation necessary to obtain the financed portion of the purchase price.

14. Closing Date:  The closing date shall be no later than the date specified above.  If it is necessary to extend the closing date or possible to close earlier, both parties shall agree to be flexible and both parties shall be kept informed as to the status of the financing commitment and financing commitment date and closing date.

15. Closing Documents:  Both parties agree that closing documents specifying the detailed terms and conditions and all other normal representations and warranties that are customary and normal in a transaction of this nature shall be prepared in due course and available a minimum of ten days prior to the closing.

16. Entire Agreement.  This agreement represents the entire agreement between the parties unless updated or modified or replaced in its entirety by a more comprehensive agreement prior to the closing.  Both parties shall execute any such update, modification or replacement before it shall take precedence over this agreement.

17. This agreement shall be subject to the laws of the state of Nevada.

18. Authority and Acceptance:
    This agreement has been executed by the undersigned parties.  The parties represent that they have the authority to enter into this agreement and that they agree to be bound by its terms until this document can be replaced in its entirety by a more definitive agreement or by the closing documents.


For Hightec, Inc.


Larry Stockett, President



For Frehner Construction, Inc.


Mr. Frehner

A FEASIBILITY STUDY FOR:

# BASALT FIBER INDUSTRIES, INC.
# VISITOR
# CENTER

## LAS VEGAS, NEVADA



FEBRUARY, 2002

WRIGHT STRUCTURAL ENGINEERING INC.
7340 SMOKE RANCH ROAD, SUITE P
LAS VEGAS, NEVADA 89128



Monolithic Dome Institute
Tomorrow's Building Available Today.

BASALT FIBER INDUSTRIES
VISITOR CENTER
FEASIBILITY STUDY
FEBRUARY 2002

BY:   FREDERICK L. CRANDALL, M.D.I.
      922 N. GILBERT RD.
      BUILDING ONE, SUITE 101
      MESA, ARIZONA 85203
      PHONE  (480) 833-3594
      FAX     (480) 833-3596

The following feasibility study is meant as assistance in design for Wright Structural Engineering, Inc. of Las Vegas, Nevada. It is not an end in itself but is meant to be used as a comparison of building/design techniques with other building systems. All information gathered and recorded has been verified as its source and was considered factual at the time of inquiry. Further research may be necessary if design development proceeds. All information gathered through Monolithic Dome Institute is based on the latest construction techniques used for the monolithic dome product. Additional structural engineering and soil analysis will be necessary to complete construction documents for both the dome and conventional structures attached.

The illustrations shown are meant to substantially meet existing local and national codes, but additional code research will be needed for final adjustments to the program during design development. A Code Review by local building officials is recommended to confirm code interpretations and local construction standards.

The design objective is to create a Visitors Center utilizing the mined basalt projects and to discover the most economical building methods to achieve these goals. The design approach used here is to build dome structures with as many varied uses as are practical using the existing site and access constraints.

Sincerely,

Frederick L. Crandall, M.D.I.

BASALT FIBER INDUSTRIES - 1
VISITOR CENTER
FEASIBILITY STUDY
FEBRUARY 2002

## SITE PLAN:

This preliminary size study is limited to the visitors center area and encompasses the building, parking, bus loading area, aquacart parking and checkout area, the golf tee off green, and the access ramps leading to the man made lake. The actual location of this area within the total site plan along with access to highway 15 is not included in this study

The building itself will be built at the existing ground level, and then basalt will be mined from beneath one edge exposing approximately 2/3 of the under side of the lower dome. The exact area of this excavation has not yet been determined as of this report. Field conditions and construction variables will determine the ultimate shape of the man made lake and its relationship to the saucer shaped building.

## RETAINING WALLS:

The retaining walls and above grade fencing will be fashioned from natural basalt materials mined on site. Double width basalt wafers will be stacked with reinforcing bar between and hen the voids will be filled with slurry for fencing up to 4'-0" height.

Exposed mining slopes will be near vertical and inspected for inherent stabilization. These canyon sides will be texture finished to match the above grade fencing.

## FOUNDATION:

Proposed foundation for the lower saucer is estimated at this time as requiring 6 total 18-inch diameter reinforced piers drilled 12-feet into the existing basalt substrate. The piers towards the lakeside of the building will have a minimum of 12-inches of basalt cover after the excavation is completed

## UTILITIES:

Water and sewer piping, part of an extensive system supplied by others, will be installed below grade in sanded beds to the nearest available taps per Clark County guidelines. Electrical feed to the 200-amp panel will also be underground. Pressure testing will satisfy installation requirements before occupancy use.

BASALT FIBER INDUSTRIES - 2
VISITOR CENTER
FEASIBILITY STUDY
FEBRUARY 2002

## MONOLITHIC CONCRETE SAUCERS:
The upper and lower concrete saucer structures will be mounted on a support saddle of natural basalt. Each half will be formed using a different building technique and then joined with a common window/support steel frame at the center. The spaces between the steel frames will be utilized as view windows for observation of the lake area, golf greens and surrounding residential development.

The lower saucer will be gravity formed using a suspension method from a ground mounted perimeter frame holding a tension structure fabric. A 4000 P.S.I. foam/shot Crete mix will be sprayed in place using A.C.I. and M.D.I. standards.

A steel support frame is bolted to the lower support frame after 28 days or concrete break testing confirms the support strength has been reached. While curing is taking place, the upper shell is air formed using the same tension fabric as the lower shell. The final assembly is accomplished by a crane lifting the upper shell onto the steel support frame on the lower shell on the foundation.

## BASALT REINFORCING RODS:
Factory and field-tested tension rods will be wire tied to the polyurethane insulation sprayed on upper and lower half shells. A.S.T.M. methods of testing will determine number and spacing of both hoop and vertical members to meet both minimum engineering requirements and building code requirements.

## WINDOW GLAZING:
Prefabricated steel window units and hollow metal doors will be added between and within the steel support frame. Some windows will be operable for ventilation. High Eer tinted glass will be selected for reflective capabilities. The saucer overhang is deep enough to provide glare protection off the water and proper shading.

## STONE PYLONES:
The two framed pylon structures are attached to the dome saucers for three reasons
1. To structurally stabilize the domes for seismic reaction
2. To provide plumbing and exhaust vent areas outside the dome while incorporating the lobby and restrooms.
3. To relate to the basalt Masonry Base, fences and lake canyon walls tying the elevation materials into a comprehension design theme.

BASALT FIBER INDUSTRIES - 3
VISITOR CENTER
FEASIBILITY STUDY
FEBRUARY 2002

The pylon walls are supposed to be 20 gauge metal stud structures with plywood shear panels and faced with a basalt wafer veneer. The veneer will be anchored to the plywood substrate using standard masonry wire ties. An effort to standardize the veneer with fences, walls in color and texture will be attempted.

## INTERIOR PARTITIONS:
18 GA. Metal studs with 5/8-inch gypsum board both sides are proposed as a standard for interior walls. All interior walls supporting the floor slab are bearing wall.

## FLOOR SLAB:
The observation deck (ground level) is a composite metal/concrete deck of 16 GA. Fluted steel deck with a 4" gravity pour of 4000 P.S.I. concrete mix added.

## ELECTRICAL:
Up to 3/4-inch diameter conduit can be embedded into the dome shell and composite floor slab. The single exterior mount panel is proposed at 200 amp single phase. This residential size panel will easily carry lighting and the HVAC loads needed.

## AIR CONDITIONING:
A 4-ton split heat pump system with below floor air distribution ducting is proposed for this building. The pad-mounted condenser will be located on the north side of the pylons behind a basalt masonry fence. Access to the airhandler will be in the downstairs mechanical space. Face stamped wall registers with intregal dampers will allow flexible distribution balancing.

## RESTROOMS:
Plumbing fixtures will be low consumption type meeting A.D.A.G. requirements for public restrooms.

## INTERIOR DISPLAYS:
Approximately 30% of the interior floor space will be covered with displays, sample materials and audiovisual equipment. The general program anticipated thus far will include the following.
- A.    History of basalt development
- B.    Mining and manufacturing process

BASALT FIBER INDUSTRIES - 4
VISITOR CENTER
FEASIBILITY STUDY
FEBRUARY 2002

      C.      Samples of modern retail products made from basalt
      D.      Samples of construction materials made from basalt
      E.      Basalt products used in automotive and aviation products
      F.      Monolithic dome home designs using basalt products

An oriented map showing all surrounding development will be situated at the center of the dome. From this position visitors will be able to see the items on the map oriented to the same items outside in the surrounding view.

Both passive and push button activated displays will be using both rear projection and led screens. Short looped A.V. presentations will supplement the pictorial examples in each display category. An information desk with a basalt fiber industry representative.

**LANDSCAPING AND PLAZA:**
A concrete apron tying the building to the bus drop off area will have exposed basalt aggregate in various patterns for color and texture. No specific landscape plan is shown but an allowance for future design and installation is included in the opinion of probable cost.

**DESIGN CRITERIA:**
Based on 2000 International Building Code
Building Type               - VB
Maximum Allowable Sq. Ft.    - 9,000   2 floors
Actual Shown               - 2,974 Sq. Ft. total

Occupant Load Based On 1 person per 50
Business                - Type B occupancy
Maximum Occupancy        - 49 based on 2450 Sq. Ft. of exhibit area

1 Exit Required
Total Height (allowable)      - 40 feet
Total Height Shown         - 18 feet

Parking Required (Clark County)  - 10 spaces
All Public Areas Are Wheel Chair Accessible

BASALT FIBER INDUSTRIES - 5
VISITOR CENTER
FEASIBILITY STUDY
FEBRUARY 2002

## PROJECT STATISTICS:

| | |
|---|---|
| Monolithic Concrete Domes 62' diameter | - 2124 sq.ft. |
| Storage / Mechanical | - 706  sq.ft. |
| Public Restrooms / Lobby | - 144  sq.ft. |
| | |
| Total | - 2972 sq.ft. |

Total Building Area (as shown)

The following categorized estimates are based on average from the Las Vegas metropolitan area, non-union but prevailing wages, with many categories develop from a square footage basis. Some items are actual quotes while other items have been estimated based on similar monolithic dome projects. The total building cost reflects the building and the surrounding amenities up to the perimeter curb. Not estimated are utility and sewer extensions and development, A & E fees, construction management, parking lot and grading design, parking lot lighting, traffic engineering and signals, off-site requirements and owner furniture and furnishings not specifically listed.

An additional feasibility study is recommended for the site development costs to be commissioned from Wright Engineering, and utility companies. A soil testing lab and an Alta survey of the proposed property as well as off-site traffic surveys are recommended as a minimum expenditure to achieve realistic estimates.

All figures included here are based on this feasibility study alone and from the schematic plans developed for the Basalt Fiber Industries, Inc.

The dome structures shown are based on steel reinforcing and 4000 P.S.I. Shotcrete using standard M.D.I. techniques. Actual costs may vary using substitute basalt reinforcing and admixtures yet to be tested and determined.

BASALT FIBER INDUSTRIES - 8
VISITOR CENTER
FEASIBILITY STUDY
FEBRUARY 2002

**CONTINGENCY: 5%**............................................... $  21,078.00

**ARCHITECTURAL / ENGINEERING FEES:(Estimated)**...... $  44,236.00

**GRAND TOTAL:**      **$486,870.00**

# TABLE OF CONTENTS

AREA MAP Las Vegas Valley      Exhibit A

SUBJECT PROPERTY      Exhibit B

CONCEPT SKETCH OF PROPERTY DEVELOPMENT      Exhibit C

PRELIMINARY FLOOR PLAN      Exhibit D

PRELIMINARY FRONT ELEVATION      Exhibit E

BASALT FIBER INDUSTRIES Visitor Center      Exhibit F

PRELIMINARY SECTION      Exhibit G



EXHIBIT A

EXHIBIT F



BASALT FIBER INDUSTRIES VISITOR CENTER

# EXHIBIT G



PYLON STRUCTURE

6' DIA. SKYLIGHT

ACOUSTICAL BAFFLES

OBSERVATION/DISPLAY AREA

ORIENTED MAP

COMPOSITE FLOOR

MECHANICAL

COMPACTED FILL

BASALT STRATA

DRILLED PIER

TENSION RING

PERIMETER SUPPORT FRAME

STORAGE

FUTURE WATER LEVEL

PRELIMINARY SECTION

# SUPPLEMENTAL INFORMATION

A TRIPOD IS CENTERED OVER THE BUILDING RADIUS POINT AND A BOWL SHAPE IS CARVED FROM THE BASALT STRATA. DRILLED PIERS WITH REINFORCING ARE INSTALLED PER ENGINEERING REQUIREMENTS. THE UPPER STEEL WILL PORTRUDE INTO BOTTOM OF LOWER SHELL FLOOR.



1

A WOODEN FRAME IS INSTALLED OVER THE BASALT BOWEL EXCAVATION AND AN AIR FORM HUNG FROM ITS EDGE DROPPING TO WITHIN INCHES OF WATER FILL IF NEEDED. AFTER PRIMING THE INTERIOR SURFACE ONE INCH OF SHOTCRETE IS SPRAYED FROM OUTSIDE THE PERIMETER. A RUNNING SLURRY IS THEN PUMPED BETWEEN THE AIRFORM AND THE BASALT BOWEL TO STABALIZE THE LOWER SHELL.



2

THE LAST MAT OF STEEL REINFORCING IS SPRAYED IN PLACE AND FORMED INTO THE PERIMETER BEARING LEDGE FOR THE UPPER SHELL. THE AIRFORM OUTER COVER IS STRIPPED AWAY AFTER PROPER CURING IS COMPLETE. SPRAYING OF SHOTCRETE MAY BY DONE FROM OUTSIDE EQUIPMENT ON J.L.G. OR INTERIOR WALKING CREW.

4

THE INTERIOR METAL FRAMING IS INSTALLED AND 20 GA. STRUCTURAL DECKING LAYED FOR THE COMPOSITE FLOOR SYSTEM. TEMPORARY BRACING IS INSTALLED AS NEEDED. THE PROTRUDING TENSION RING STEEL IS INTERLOCKED INTO THE CONCRETE FLOOR SLAB AS PART OF THE LOWER SHELL STRUCTURE. THE PERIMETER WOOD REMAINS IN PLACE UNTIL THE FLOOR CURES.



5

6



THE STELL TUBE PERIMETER SUPPORT FRAME IS WELDED IN PLACE ONTO THE LOWER SHELL.  THE PERIMETER WOOD BRACING UPPER HORIZ. SUPPORT SERVES AS THE UPPER AIRFORM ATTACHMENT FOR INFLATION.  THE UPPER SHELL IS CONSTRUCTED BY TYPICAL STANDARDS OFF A ROLLING SCAFFOLD. THE WOOD BRACING IS REMOVED AND THE LOWER SHELL IS PARTIALLY UNDEREXCAVATED LEAVING A MINIMUM 12" COVER OVER THE DRILLED PIERS.

6' DIA. SKYLIGHT OPENING

PLYWOOD OVER OPENINGS

COMPOSITE FLOOR

DRILLED PIER

TENSION RING

PERIMETER SUPPORT FRAME

# The Monolithic Process



1 The Monolithic Dome starts as a concrete ring foundation, reinforced with steel re-bar. Vertical steel bars embedded in the ring later attached to the steel reinforcing of the dome itself. Small domes may use an integrated floor/ring foundation. Otherwise, the floor is poured after completion of the dome.



2  An Airform—fabricated to the proper shape and size—is placed on the ring base. Using blower fans, it is inflated and the Airform creates the shape of the structure to be completed. The fans run throughout construction of the dome shell.



3 Polyurethane foam is applied to the interior surface of the Airform. Entrance into the air-structure is made through a double door airlock which keeps the air-pressure inside at a constant level. Approximately three inches of foam is applied. The foam is also the base for attaching the steel reinforcing rebar.



4 Steel reinforcing rebar is attached to the foam using a specially engineered layout of hoop (horizontal) and vertical steel rebar. Small domes need small diameter bars with wide spacing. Large domes require larger bars with closer spacing.



5 Shotcrete—a special spray mix of concrete—is applied to the interior surface of the dome. The steel rebar is embedded in the concrete and when about three inches of shotcrete is applied, the Monolithic Dome is finished. The blower fans are shut off after the concrete is set.



3007 E. 49th N.
Idaho Falls, ID 83401
Phone (208) 529-0833
Fax (208) 529-0854

CALIFORNIA ENERGY COMMISSION
PASSIVE SOLAR HANDBOOK
1.4 OPTIMAL USE OF MASS AND INSULATION

A heavy wall must have two qualities in order to dampen diurnal changes in the exterior environment and thus keep the internal temperature of a room relatively constant: heat capacity-- the ability to store heat, and low heat conductivity--the ability to resist, or to insulate against heat flow. If one intermittently exposes and adobe brick first to a blow torch and then to cold water (and if each exposure time is relatively short) the temperature of the brick never reaches either extreme, bu oscillates somewhere in between. The heat capacity of the brick keeps its temperature from rising rapidly with the small heat addition, or dropping rapidly with the small heat extraction. The brick's insulating quality prevents heat from entering or leaving very rapidly.

Adobe, however, doesn't happen to have the optimum combination of eat capacity and insulation. This problem can be resolved by the way the material is used which is an important as what material is used. The most effective way of maximizing the two qualities--the capacity and insulation--in a building wall is to use two separate materials. Ideally, one would choose a material with little heat capacity but high resistance to heat flow, and a material with high heat capacity having little resistance to heat flow. By placing the insulating material next to the external environment, little heat is allowed into or out of the building and with the high heat capacity material next to the inside environment, what heat does enter or leave (primarily through windows and interior heat generation) can't change the temperature of the heat capacity material rapidly. Thus, little heat is let in or out, and the high capacity material slowly stores heat. The building's thermal mass damps out temperature fluctuations.

Thus a more ideal wall than adobe alone would be one made of externally insulated adobe or externally insulated concrete. This concept of externally insulated, high mass construction is common to all of the passive concepts in this handbook except those using isolated heat storage arrangements such as the rock bed thermosiphon system.

NOTE: This page was taken from the California Energy Commission "Passive Solar Handbook"

**REPORT:  The Thermal Efficiency of the Monolithic Dome**

To whom it may concern:

I have compared the envelope heating and cooling loads of the monolithic structure to conventional building methods. * The monolithic structure has definite advantages in thermal performance over conventional types of construction.

Some of the advantages are:

I.    **Shape**: Lower surface area to volume ratio, lower perimeter to floor area ratio; Heat is either gained or lost through the surface area and perimeter of a building. Compared to buildings of equal floor area and volume the monolithic structure will always have less surface area and perimeter. Less surface area allows less heat loss or gain.

2.    **Thermal storage capacity ("heat sink")**: The massive concrete shell stores incoming heat and releases it slowly to reduce peak loads.

3.    **Location and type of insulation:** Polyurethane foam has the highest insulative value of building insulations. Inasmuch as the insulation is bonded to the outside of the concrete, it reduces the amount of heat being transferred into or lost from the concrete to outside conditions, thus increasing the temperature buffering effect of the concrete mass.

4.    **Lower infiltration rates:** (How much wind is blowing through seams, openings and cracks etc.)  Conventional structures usually have much higher infiltration rates than the seamless, nearly air-tight monolithic dome.  The attached examples for a 105 ft. diameter dome compared to a conventional building of equal floor area and volume illustrate the relative performance of the building envelopes.

   *The calculation methods used were those adopted by the American Society of Heating, Refrigeration and Air Conditioning Engineers, a nationally recognized organization.  The methods of calculation were programmed into a computer to reduce calculation time and make it possible to compare readily a wide variety of buildings.*

   Sincerely,

   BRENT HELMS
   HELM ENGINEERING

Nature's Perfect Form
The Future's Perfect Structure

# COLD STORAGE - ENVELOPE REFRIGERATION LOAD COMPARISONS

105' diameter monolithic dome vs. 75' x 115' x 20.5' conventional building

Design temperature: 32° F inside
                    89° F outside

| Envelope | Refrigeration Load (BTU/H) |
|---|---|
| Dome,   5" polyurethane (white) | 25,749 |
| Galv. Metal, . 5" polyurethane | 38,972 |
| Galv. Metal,   6" styrofoam | 48,747 |
| Block,   5" polyurethane w/ built-up-roof | 40,602 |
| Block,   5" styrofoam w/ built-up-roof | 50,723 |

Sun-glo of Idaho Inc., Rexburg, Idaho is the owner of a 75' diameter 64,000 cu. ft. monolithic freezer with an inside design temperature of 0° F and outside 87° F.

The actual HP of their condenser equipment is 25 HP.   Their hour meter indicates that it runs 75% - 85% of the time during peak load conditions.

This matches the calculated load.

Nature's Perfect Form
The Future's Perfect Structure

## HEATING AND COOLING LOAD COMPARISONS

105' diameter monolithic dome vs. 75' x 115' x 20.5' conventional building

Design temperature: 70° F inside
Summer:          89° F outside
Winter:          -10° F outside

| Design type | Heat (BTU/H) | Cool (BTU/H) |
|---|---|---|
| Dome,  3" polyurethane,  light color | 56,339 | 10,321 |
| Galv. Metal,  3" polyurethane | 76,735 | 27,942 |
| Galv. Metal.,  4" styrofoam | 82,155 | 30,482 |
| Galv. Metal,  6" batts | 85,252 | 31,934 |
| 8" Block,  pearlite cores, R-30 built up roof | 145,844 | 32,979 |
| 8" Block,  pearlite cores,  R-11 walls,  R-30 built-up-roof | 81,252 | 22,984 |
| Frame construction,  R-11 wall,  R-30 roof  (Dark) | 107,409 | 36,933 |
| Frame construction,  R-19 wall,  R-38 roof  (Dark) | 74,240 | 19,529 |

## COOLING LOAD COMPARISON

105' Diameter monolithic dome vs. 45' x 200' x 20' metal building

Potato storage - Design Temperature: 45° F inside
                                87° F outside

| Design Type | Cooling load (BTU/H) |
|---|---|
| Dome,  3" polyurethane | 26,974 |
| Metal,  3" polyurethane | 51,049 |

End of Report.

California Energy Commission

# Passive Solar Handbook

## 1.4 Optimal Use of Mass and Insulation

A heavy wall must have two qualities in order to dampen diurnal changes in the exterior environment and thus keep the internal temperature of a room relatively constant: *heat capacity* — the ability to store heat, and *low heat conductivity* — the ability to resist, or to insulate against heat flow. If one intermittently exposes an adobe brick first to a blow torch and then to cold water (and if each exposure time is relatively short) the temperature of the brick never reaches either extreme, but oscillates somewhere in between. The heat capacity of the brick keeps its temperature from rising rapidly with the small heat addition, or dropping rapidly with the small heat extraction. The brick's insulating quality prevents heat from entering or leaving very rapidly.

Adobe, however, doesn't happen to have the optimum combination of heat capacity and insulation. This problem can be resolved by the way the material is used which is as important as what material is used. The most effective way of maximizing the two qualities — heat capacity and insulation — in a building wall is to use two separate materials. Ideally, one would choose a material with little heat capacity but high resistance to heat flow, and a material with high heat capacity having little resistance to heat flow. By placing the insulating material next to the external environment, little heat is allowed into or out of the building and with the high heat capacity material next to the inside environment, what heat does enter or leave (primarily through windows and interior heat generation) can't change the temperature of the heat capacity material rapidly. Thus, little heat is let in or out, and the high capacity material slowly stores heat. The building's thermal mass damps out temperature fluctuations.

Thus a more ideal wall than adobe alone would be one made of externally insulated adobe or externally insulated concrete. This concept of externally insulated, high mass construction is common to all of the passive solar concepts in this handbook except those using isolated heat storage arrangements such as the rock bed thermosiphon system.



# Marketing strategy and future product offerings

Basalt Fiber Industries, Inc. will initially target the fiber reinforced concrete (FRC) market, which currently commands a high price for polypropylene cut filament. Prices for polypropylene fibers currently used in the cement and concrete markets currently sell for $2.50 per pound. One to two and one half pounds of polypropylene fibers are typically used for each yard of reinforced concrete. Over 100 million yards of FRC were produced in 2000 in the U.S. alone. For other applications currently being served by Russian Basalt fibers, prices vary from $1.25 to $1.50 per pound of filament, depending on filament type, sizing, and application. Since these markets are small and production capacities at Basalt Industries will initially be allocated, there will be a good "fit" between Basalt Fiber Industries, Inc. and the niche markets.

These niche markets are already served by Ukrainian and Russian manufacturers, so the customers are familiar with basalt filament. This means that they do not need to be educated about basalt that will result in a fast market penetration. These customers already express the need for a larger supply than the Ukrainian and Russian suppliers can offer. Furthermore, North American customers are apprehensive of the reliability of the Ukrainian and Russian supply, because of economic, political, and geographical conditions. This offers Basalt Industries, Inc. an opportunity to establish itself quickly in these niche markets - where the Ukrainian and Russian manufacturers did the "trailblazing" - and get a high price for the filament.

Longer term plans aim at conquering larger markets as Basalt Fiber Industries, Inc. production capacity increases and as Basalt Industries, Inc. develops more products for different markets. Basalt Fiber Industries, Inc. has high expectations of penetrating the cement reinforcement market, where glass, polypropylene, and steel filament has made only very modest inroads. This is due to the special - and very costly - formulation that has been developed for glass that can withstand the strong alkaline conditions in cement. Since basalt has a natural strength in alkaline environments it needs no costly modifications and is ideally suited for application in cement and concrete .

Basalt Fiber Industries, Inc. has a commitment from a sales person with many years experience selling Fibermesh products to the concrete industry. He is a technically astute marketing professional, with an outstanding track record in the industrial, commercial, residential , OEM and fibers market. He has proven ability in direct sales, key account retention and, sales force training, motivating and managing sales personnel. He is also experienced in planning, developing and implementing new product lines. He has demonstrated high performance in increasing sales. This sales person will introduce and follow up on Basalt Industries, Inc. product entries.

# Product description

Basalt glass filament is a continuous fiber of 100% basalt glass that can be made with any single diameter between seven and thirty micron (millionth of a meter). The length can vary from chopped strand of an eight of an inch to continuously wound fiber of many miles length. All fiber is coated with a "sizing", a mix of chemicals to impart better properties to the fiber and is applied as a very thin layer by a contact or spray process.

It is important that there be no large crystals present in the fibers, since crystals act as discontinuities, causing the fiber to break where the crystal is. Also, dust or any other fine particles must be kept away from the fibers while they are forming, since they might get embedded in the semi liquid form of the fiber while it is being formed. Small particles (stones) from refractories, e.g. used in a furnace, must also be kept from getting into the molten basalt, since they act as discontinuities, making the fibers break. Finally, tiny gas bubbles (seeds), from the melting process must be kept from getting into the molten basalt because they make the fibers break just as stones do.

# Manufacturing Process

## Raw material

Basalt glass filament is made from basalt, a dark gray to black, dense, fine-grained, igneous (volcanic) rock, which is the major constituent of oceanic islands and a common component of the continental land masses as well. It is the most common form of volcanic rock and it occurs more often than all other forms of volcanic rock combined. In the United States, basalt is observed along the Connecticut River Valley of Massachusetts and Connecticut and along the Hudson River valley of New York and New Jersey. It is widespread throughout the Rocky Mountain region, the Pacific Northwest, the Nevada mining districts, and composes almost all of the Hawaiian Islands. Basalt is hard, strong and chemically resistant, particularly to alkali. Basalt Industries, Inc. intends to buy basalt from existing quarries. Basalt from existing quarries is mainly used for road beds, as an aggregate in concrete, and in filter systems and is subject to strict DOT quality regulations when used in roads. There is enough basalt for centuries to come. Basalts from the various quarries have basically the same chemical compositions, so that Basalt Industries, Inc. can switch from one quarry to another without a major impact on the process or product conditions or properties.

Basalt in its virgin shape is a rock of mainly crystalline nature with the following typical chemical composition:

| silicon dioxide | $SiO_2$ | 40 - 65 % |
| aluminum oxide | $Al_2O_3$ | 10 - 20 % |
| calcium oxide | $CaO$ | 5 -15 % |
| magnesium oxide | $MgO$ | 5 - 15 % |
| iron oxides | $FeO + Fe_2O_3$ | 5 - 15 % |
| potassium oxide | $K_2O$ | 0 - 3 % |
| sodium oxide | $Na_2O$ | 0 - 5 % |
| various trace elements | | 0 - 0.2 % |

Basalts are divided in three main classes:

- tholeiites
- olivine tholeiites
- alkali basalts

Within one particular class of basalts, the composition variation, even across the continents, is not great. The tholeiitic basalts have distinct advantages over the other groups since they have the lowest liquidus (lowest temperature at which basalt is completely liquid), a very important factor in filament making. Furthermore, tholeiitic flows are very extensive and their composition remarkably uniform. The other basalts are also suitable for filament making but the process conditions will be more critical. Basalt from Northern New Jersey is of the tholeiitic group, which means it is favorable for filament making.

Contrary to conventional glass filament, which is made from several pure and high cost raw materials, basalt is the only raw material for basalt filament. This is an added and inherent cost advantage over conventional glass, whose raw materials costs around 10 cents per pound final product. Basalt costs around 1 cent per pound final product.

Another advantage of basalt over conventional glass filament making is the cost of pollution control of the latter. Some of the raw materials of conventional glass are volatile and toxic, meaning that the process necessitates elaborate and costly air pollution control equipment. It also means high operating cost. Basalt is free from volatile or polluting elements and requires a minimum investment in pollution control equipment.

# Melting process

Since basalt is mainly crystalline in its natural virgin shape, it needs to be melted to eliminate all crystals and form a homogeneous melt. The filament making process uses molten basalt of about the filament making temperature (1,250 - 1,300 $^0$C). It is important that all crystals are absent from the molten basalt - meaning that the basalt must be 100% liquid. Since basalt contains several different crystals, which melt at different temperatures, it stands to reason that virgin basalt must be heated to a temperature of at least the liquidus and kept at that temperature for a while. The longer basalt is kept at a high temperature the more certain it is that all crystals have melted and the higher the holding temperature, the shorter the holding time can be. Besides melting, crystals will also dissolve in the already molten basalt, which speeds up the melting process.

Melting will be done in a natural gas heated furnace. Basalt rocks are fed into the furnace on one side, melted, and flow on the opposite side into the Volcanic Rock and Roller operation as molten basalt.

# Filament making process

Basalt Fiber Industries, Inc. has exclusive rights to use the Volcanic Rock and Roller system for the manufacturing of a continuous basalt fiber. The system consists of delivering a controlled stream of homogeneous, decrystallized and isothermal molten basalt to two sets of super alloy rollers rotating at high speed. The first set converts the cylindrical stream into a thin flat ribbon and the lower pair of 'heads", grooved precisely, divides that ribbon into hundreds (or thousands) of solidifying individual filaments.

A third set of heads will attenuate these still-ductile filaments reducing them to desired diameter, and assembling them neatly into a cake, roving, or chopped to length finished product.

The prototype Volcanic Rock and Roller system produced high-quality basalt filament for hours at a time, using a primitive melting system.

With the precisely controlled flow of molten basalt a Volcanic Rock and Roller system can be modified to match any rate of melted basalt, 2, 4, 6, etc. tons per hour.

# Sizing

Once basalt filament is made, it needs to be coated with a "sizing". A sizing is typically a mix of various chemicals, applied in a thin layer on the filament's surface, to protect the filament from abrading itself and enhance its reinforcing properties.

To protect the filament from abrading itself, a sizing typically contains a lubricant, so that individual filaments slide smoothly over each other without cutting. A surfactant is usually added to ensure that the sizing chemicals spread entirely over the surface of the filament. A preservative is typically added to prevent growth of algae and bacteria in the sizing solution to add shelf life.

For filament destined for weaving, PVA (poly vinyl alcohol) or starch is added.

# Material Safety Data Sheet

**Basalt Fiber Industries, Inc.**
3769 Mesa Linda Drive
Las Vegas, Nevada 89120

Emergency Phone: 702 369-2126

## SECTION 1: Product Identification

**Product Name:** Basalt Filament
**Generic Name:** Vitreous Fiber Made from Basalt
**Chemical Name:** Mixture

**CAS#:** 212967-54-9
**Formula:** Mixture
**Hazard Label:** None

## SECTION 2: INGREDIENTS

Under OSHA's Hazard Communication Standard (29 CFR 1910.1200) this product qualifies as an article in that its end use is dependent upon its shape and design, and it will not release, or otherwise result in exposure to a hazardous chemical under normal conditions of use.

## SECTION 3: HAZARD IDENTIFICATION

### Emergency Overview

**APPEARANCE and ODOR:** Golden brown to a dark brown fibrous glass with no odor.

Under normal conditions of use, this product is not expected to create any unusual emergency hazards.

Skin cuts or irritations may occur from contact with large diameter glass filaments. Treat as any other cut.

In the event of fire, use normal fire fighting procedures to prevent inhalation of smoke and gases.

### Potential Health Effects

**Acute (Short-Term) Health Effects:** Large diameter glass filaments in this product may cause cuts or skin irritation when handling this product without gloves.
**Chronic (long-Term) Health Effects:** Not applicable.
**Target Organs:** Skin.
**Absorption:** Not applicable.
**Ingestion:** Product is not intended to be ingested or eaten under normal conditions of use. If ingested, it may cause temporary irritation to the gastrointestinal (GI) tract, especially the stomach.
**Eye:** Not applicable.

## SECTION 4 First Aid Measures

**Inhalation:** Not applicable.
**Skin:** Remove glass from open cuts, and bandage or treat as any other cut.
**Absorption:** Not applicable.

**Ingestion:** Product is not intended to be ingested or eaten. If this product is ingested, irritation of the gastrointestinal (GI) tract may occur, and should be treated symptomatically. Rinse mouth with water to remove fibers, and drink plenty of water to help reduce the irritation. No chronic effects are expected following ingestion.

**Eye:** Not applicable.

**Notes to Physician:** No special procedures are necessary for treatment of cuts or irritation resulting from this product. Cuts may be caused by large diameter glass filaments, and should be cleaned and treated as any other cut.

## SECTION 5: FIRE FIGHTING MEASURES

**Flash Point and Method:** None.

**Flammability Limits (%):** None.

**Auto Ignition Temperature:** Not Applicable

**Extinguishing Media:** Water, foam, CO2 or dry chemical.

**Unusual Fire and Explosion Hazards:** None known.

**Fire Fighting Instructions:** Use self contained breathing apparatus (SCBA) in a sustained fire.

**Hazardous Combustion Products:** Primary combustion products are carbon monoxide, carbon dioxide, and water. Other undetermined compounds could be released in small quantities.

## SECTION 6: ACCIDENTAL SPILL/RELEASE MEASURES

**Land Spill:** Scoop up material and put into suitable container for disposal as a non-hazardous waste.

**Water Spill:** This material will sink and disperse along the bottom of waterways and ponds. It can not easily be removed after it is waterborne; however, the material is non-hazardous waste.

**Air Release:** This material will settle out of the air. If concentrated on land it can then be scooped up for disposal as a non-hazardous waste.

## SECTION 7: HANDLING AND STORAGE

**Storage Temperature:** Not applicable.

**Storage Pressure:** Not applicable.

**General:** No special storage or handling procedures are required for this material.

## SECTION 8: EXPOSURE CONTROL/PERSONAL PROTECTION

**Summary:** No special protective measures are necessary for use of this product in that it is an article, and under normal conditions of use is not expected to release, or otherwise result in exposure to a hazardous chemical.

**Eye:** Not required.

**Skin:** Leather or cotton gloves may be worn to prevent cuts that may be caused by sharp pieces of glass in the product.

**Respiratory:** Not required.

**Ventilation:** No special ventilation systems are required under normal conditions of use.

**Other:** Loose-fitting, long-sleeved clothing should be worn to protect skin from irritation. Exposed skin areas should be washed with soap and warm water after handling or working with basalt filament. Clothing should be washed separately from other clothes, and the washer should be rinsed thoroughly (run empty for a complete wash cycle). This will reduce the chances of basalt being transferred to other clothing.

**Special considerations for repair/maintenance of contaminated equipment:** None.

## SECTION 9: PHYSICAL AND CHEMICAL PROPERTIES

**Vapor Pressure (mm Hg @ 20deg C) :** Not applicable.
**Vapor density (Air=1):** Not applicable.
**Specific Gravity (water=1):** 2.60.                    **Boiling Point:** Not applicable.
**Solubility in Water:** Insoluble.                      **Viscosity:** Not applicable.
**PH:** Not applicable.                                   **Physical State:** Solid.
**Appearance:** Solid.                                    **Freezing Point:** Not applicable
**Odor Type:** None.
**Evaporation Rate (n-Butyl Acetate = 1):** Not applicable.

## SECTION 10: STABILITY AND REACTIVITY

**General:** Stable.
**Incompatible Materials and Conditions to Avoid:** None.
**Hazardous Decomposition Products:** Sizings may decompose in a fire.  See Section 5 of MSDS for combustion products statement.
**Hazardous Polymerization:** Will not occur.

## SECTION 11: TOXICOLOGICAL AND EPIDEMIOLOGICAL DATA

This product has not been tested as a separate entity.  Therefore, the hazards must be evaluated on the basis of the individual ingredients, and those hazards must be assumed to be additive in the absence of complete information.  The hazards described in this document have been evaluated based on a threshold of 1.0% for all hazardous ingredients and 0.1% for all carcinogens.

**Acute Effects:** This product is not expected to present any acute toxicological effects in that under normal conditions of use, it will not release or otherwise result in exposure to a hazardous chemical.

The LD50 and LC50 (dose or concentration lethal to 50% of a population of test animals) for this product have not been determined.

**Chronic Effects:** None known.

## SECTIONAL 12: ECOLOGICAL INFORMATION

**Ecotoxicity:** Product has not been tested for ecotoxicity.

## SECTION 13: DISPOSAL CONSIDERATIONS

**RCRA Hazard Class:** Non-hazardous.

## SECTION 14: TRANSPORT INFORMATION

**U.S Department of Transportation Shipping Classification:** Not Classified a hazardous material.

MSDS

# SECTION 15: REGULATORY INFORMATION

**TSCA Status:** Each Ingredient is on the inventory

**SARA Title III:**   **Hazard Categories:**

| | |
|---|---|
| Acute Health: | Yes |
| Chronic Health: | No |
| Fire Hazard: | No |
| Pressure Hazard | No |
| Reactivity Hazard | No |

**Reportable Ingredients:**

| | |
|---|---|
| Sec. 302/304 | None |
| Sec. 313: | None |

**California Proposition 65:** No ingredient is listed.

**WHMIS (Canada): Status:** No ingredient is listed.
WHMIS Classifications (s)  None

# SECTION 16: OTHER INFORMATION:

**HMIS and NFPA Rating:**

| Category | HMIS | NFPA |
|---|---|---|
| Acute Health | 1 | 1 |
| Flammability | 0 | 0 |
| Reactivity | 0 | 0 |

**NFPA Unusual Hazards:** None.

**HMIS Personal Protection:** To be supplied by user depending upon use.

Revision Summary As of the date of preparation of this document, the foregoing information is believed to be accurate and is provided in good faith to comply with applicable federal and state law(s). However, no warranty or representation with respect to such information is intended or given.

**ID:** 00763245

**Title:** PERFORMANCE EVALUATION OF 3-D BASALT FIBER REINFORCED CONCRETE & BASALT ROD REINFORCED CONCRETE

**Author:** Ramakrishnan, V; Tolmare, NS; Brik, VB

**Corporate Author:** Transportation Research Board

**Series:** NCHRP-IDEA Program Project Final Report

**Pages:** 96p

**Date:** November 1998

**Features:** Figs. Tabs. Phots. 21 Ref.

**Abstract:** This Innovations Deserving Exploratory Analysis (IDEA) report presents the experimental investigation carried out to evaluate the performance characteristics of basalt fiber reinforced concrete and basalt bar reinforced concrete. All the experiments were conducted following the American Society for Testing and Materials (ASTM) standards. The test program was conducted for fresh and hardened concrete properties. The fresh concrete properties consisted of the following tests: slump, Vebe slump, Vebe time, concrete temperature, air content and unit weight. The hardened concrete properties determined were compressive strength, static modulus, flexural strength, load-deflection behavior, comparison of load-deflection curves, ASTM toughness indices, first crack toughness, post crack behavior, Japanese standard method for toughness indices and equivalent flexural strength. The test results show that the basalt fiber can be easily mixed in the concrete without any balling, bridging or segregation. There was a noticeable increase in the post crack energy absorption capacity and ductility due to the addition of basalt fibers. The impact resistance increased as the fiber content increased. For beams reinforced with basalt bars supplied by the manufacturer, the load deflection curves were plotted and the toughness indices and first crack toughness were calculated in a similar way as the ASTM standards for the beams reinforced with basalt fibers. Toughness indices according to the Japanese standard method and the equivalent flexural strength were also calculated for the beams reinforced with basalt bars supplied by the manufacturer. For beams reinforced with basalt bars designed and cast in the lab, strain across the depth of the beams was measured using electrical resistance strain gages, and deflection was measured using a magnetic dial gauge. These tests indicated that there was insufficient bond strength and the bars slipped gradually before the ultimate load was released. Beams with increased development lengths failed suddenly with breaking of rods. The ultimate-load and cracking-load moments and the deflections of the basalt rod reinforced concrete beams were compared. The tension tests were conducted on the basalt bars and on a cable, having two basalt bars twisted together. Graphs of stress vs. strain were plotted and the modulus of elasticity of the basalt bars was calculated.

**Notes:** This NCHRP-IDEA investigation was conducted by the South Dakota School of Mines and Technology, Rapid City, South Dakota. The fibers and bars were supplied by Research & Technology, Inc., Madison, Wisconsin.

**Descriptors:** TECHNOLOGICAL INNOVATIONS // REINFORCED CONCRETE // REINFORCING BARS // FIBER REINFORCED CONCRETE // BASALT // FRESH CONCRETE // CONCRETE TESTS // SLUMP TEST // TEMPERATURE // AIR CONTENT // WEIGHT // COMPRESSIVE STRENGTH // FLEXURAL STRENGTH // LOADS // DEFLECTION // TOUGHNESS // ENERGY ABSORPTION // DUCTILITY // BOND STRENGTH (MATERIALS) // TENSION TESTS // DEFORMATION CURVE // MODULUS OF ELASTICITY

**Status:** AVAILABLE FROM TRB BOOKSTORE

**Availability:** http://nationalacademies.org/trb/bookstore



AQUACART

CERTIFICATE OF SERVICE


The  undersigned hereby certifies that a true and correct copy of the foregoing
 ATTACHMENTS TO DEFENDANT'S VERIFIED RESPONSE TO COMPLAINT was
served upon the following by placing a copy of the same in the regular United States
mails, postage pre-paid, addressed as follows this 22nd day of May, 2002.  This is twenty
days after the receipt of complaint that was served on May 2, 2002.

Julie K. Lutz
Michael R. MacPhail
Kelli Ferrand Chan
Securities and Exchange Commission
1801 California Street, #4800
Denver, Colorado 80202

Blaine T. Welsh
United States Attorney's Office
333 Las Vegas Boulevard, Suite 5000
Las Vegas, Nevada 89101

I declare under penalty of perjury that the foregoing is true and correct.

_Larry A. Stockett_

Larry A. Stockett